## CARL RAY MILLARD *v.* STATE OF MARYLAND

[No. 138, September Term, 1969.]

*Decided January 12, 1970.*

The cause was argued before MURPHY, C.J., and ANDERSON, MORTON, ORTH, and THOMPSON, JJ.

*Autry N. Noblitt* for appellant.

*Donald Needle, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Arthur A. Marshall, State's Attorney for Prince George's County,* and *Raymond F. Ciarrocchi, Assistant State's Attorney for Prince George's County,* on the brief, for appellee.

MURPHY, C.J., delivered the opinion of the Court.

Charged with the offense of robbery with a deadly weapon, appellant filed a written plea that he was insane at the time of the commission of the crime under Maryland Code, Article 59, Section 9(a), which provides:

> "A defendant is not responsible for criminal conduct and shall be found insane at the time of the commission of the alleged crime if, at the time of such conduct as a result of mental disease or defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the require-

ments of law. As used in this section, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct."

The basis for appellant's insanity plea, as later unfolded at the trial, was that he had an extra Y chromosome in the brain and other cells of his body which constituted, within the meaning of Section 9(a), a mental defect resulting in his lacking substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.

At the trial before a jury in the Circuit Court for Prince George's County, the State established the *corpus delicti,* adduced proof of appellant's criminal agency, and then rested its case. Thereafter, under the prescribed Maryland procedure, it became incumbent upon the appellant in undertaking to establish his insanity defense to first adduce sufficient competent proof in support thereof, out of the presence of the jury, from which the trial judge could properly find, as a preliminary matter of law, that the presumption of sanity had been rebutted and a doubt raised in the minds of reasonable men as to his sanity. See *Jenkins v. State,* 238 Md. 451; *Fowler v. State,* 237 Md. 508; *Saul v. State,* 6 Md. App. 540; *Strawderman v. State,* 4 Md. App. 689; *McCracken v. State,* 2 Md. App. 716. To this end, and in conformity with the approved procedure, appellant adduced evidence through the testimony of a Lieutenant at the Prince George's County jail showing that while in confinement appellant was agitated, nervous, upset, and became so violent on occasions that he had to be handcuffed and shackled in leg irons; that appellant cut himself five or six times on his arm between the elbow and the wrist, resulting in severe bleeding, although no arteries were severed; that these cuts "ran the gamut from scratches to very severe cuts requiring quite a number of sutures"; and that as a result of his condition, appellant was sent to three different hospitals for treatment and evaluation.

Dr. Cecil Jacobson, the appellant's only medical witness, testified that he was an Assistant Professor in the Department of Obstetrics and Gynecology and Chief of the Reproduction Genetics Unit of the George Washington University School of Medicine; that he had obtained a degree in genetics from the University of Utah in 1960 and was "a research teacher teaching the full-time faculty" at the University; that he had published 42 articles in the field of genetics, had conducted extensive research in the field, supervised a number of genetics laboratories, and was a consultant in genetics to the Federal Government. He stated that in 1964 he also obtained a medical degree and was licensed to practice medicine in Maryland, Virginia and the District of Columbia; that he had interned for one year in 1964-1965 but did not serve a residency in medicine but "went directly into the academic program [at George Washington University] because he had an active teaching responsibility as a medical student." He testified that while he received formal training in psychiatry as a medical student, and had received clinical experience in the psychiatric wards during his medical internship, he was not a psychiatrist, had received no post-graduate training in psychiatry, was neither Board eligible nor Board certified, and had "no competence" in the field of psychiatry beyond that possessed by "the conventional physician." He testified that he was in the active practice of "academic medicine" but only as a consultant to other physicians; that he had participated in a number of research protocols in mental illness; that a considerable portion of his practice in genetics fell within the area of mental illness, "especially mental retardation;" that he had acquired intimate experience counselling patients who sought therapeutic abortions to realize the "psychological implication of the miscarriage;" and that a considerable part of his genetics practice involved "counselling the recurrence significant of birth defects"—an area which he said fell within "the realm of psychiatric practice."

Dr. Jacobson testified that genetics was "a sub-special-

ity biology" having "quite a bit of inference in medicine," involving a specific diagnostic technique dealing with the "very basis of human development, the chromosome material;" that "chromosomes [in the cells of the body] are the way that all genetic machinery is passed from one generation to another;" that "all things that are passed on from parent to child must go through chromosomes;" and that 46 chromosomes constituted the normal complement per cell and a person who possessed 47 chromosomes was genetically abnormal.

Dr. Jacobson testified that on December 16, 1968, appellant was examined and his body cells found to contain an extra Y chromosome (XYY); that the presence of this extra chromosome constituted a "basic defect in the genetic complement of the cell" affecting not only the way the cells grow in the body, but also the physical growth of the body itself; that the presence of the extra Y chromosome caused "marked physical and mental problems" affecting the manner in which persons possessing the extra Y chromosome "will react to certain stimulus; certain physiological problems; certain behavioral characteristics." Dr. Jacobson then told of appoximately 40 published reports indicating that persons possessed of an extra Y chromosome tended to be very tall, with limbs disproportionate to their body; that such persons had marked antisocial, aggressive and schizoid reactions and were in continual conflict with the law.

Dr. Jacobson stated that he had never previously testified in court. Asked whether he was familiar with the Maryland test of insanity, as defined in Section 9(a), he said that he had never read it, but believed it contained two parts—"One, whether there was a basic defect involved, and, secondly, whether or not the person is competent for his act." Section 9(a) was then read to Dr. Jacobson, and he was then asked whether appellant was insane. Dr. Jacobson responded with a professorial narrative of appellant's genetic make-up, after which he concluded that "if the definition of insanity has a mental de-

fect, the answer is yes, he has a mental defect based up-
on his abnormal [chromosome] test." Asked whether the
"defect" was such as to cause appellant to lack "substan-
tial capacity either to appreciate the criminality of his
conduct or to conform his conduct to the requirements
of law," Dr. Jacobson answered:

> "I cannot say that because I have not examined
> him as a psychiatrist. I have no competence in
> that area."

Appellant's counsel then told the court that he intended
to show through "case histories" that individuals hav-
ing the extra Y chromosome have extremely aggressive
personalities, "to the extent that most of them end up in
jail for one reason or another because of their aggressive
reactions." Dr. Jacobson was then asked to examine ap-
pellant's arms to determine whether the cuts thereon were
"suicidal or merely attention cuts." Dr. Jacobson did so
briefly and stated that based on his experience as a medi-
cal doctor, he believed the cuts constituted an actual at-
tempt at suicide; that based on this fact, and his brief
questioning of appellant during a five-minute court re-
cess, he felt appellant's "reactions" were not normal; that
appellant had a fear of "forceful activity with an attempt
at extension of this regression and a lack of adequately
controlling this;" that although he was "greatly re-
stricted" by not knowing the "developmental history" of
appellant, he believed, based upon the testimony of the
jail lieutenant concerning appellant's conduct while in
confinement, including the suicide attempts, coupled with
appellant's genetic defect, that "this does not fall with-
in the realm of sanity, as I understand it." Dr. Jacobson
then testified that the extra Y chromosome in appellant's
genetic make-up affected his behavioral patterns, as re-
ported in other cases of persons similarly possessed of
the extra Y chromosome. He conceded that persons hav-
ing the extra Y chromosome may differ among them-
selves depending upon "what other physical effects are
found in the body of the XYY," environment also being

a factor accounting for differences between XYY individuals.

Under further questioning by the trial judge, the prosecutor, and defense counsel, Dr. Jacobson stated that appellant's genetic defect — which he characterized as a mental defect—influenced "his competence or ability to recognize the area of his crime;" that appellant had a "propensity" toward crime because of his genetic abnormality; that based upon the medical literature, the appellants' conduct and behavioral patterns, and his genetic defect, he was insane and not even competent to stand trial. The doctor defined insanity in terms of the "ability to comprehend reality" or the "inability to judge one's action as far as consequence." Dr. Jacobson next testified that he had "insufficient evidence" upon which to base a conclusion whether appellant appreciated the consequences of his action, but that because he had attempted to commit suicide, such an act constituted "an inability to comprehend the consequences of his act, the act of suicide, being death;" and that appellant's actions were "not consistent with sanity."

At the conclusion of Dr. Jacobson's testimony, the trial judge indicated that he believed appellant had adduced sufficient evidence to rebut the presumption of sanity and permit the case to go to the jury. The prosecutor urged that the court withhold its ruling until it heard from the State's psychiatrist, Dr. Robert Sauer. There being no objection by appellant to this procedure, Dr. Sauer then testified that after extensive psychiatric examination of appellant, he had concluded, as did five other State psychiatrists, that appellant was not insane within the test prescribed in Section 9(a). He diagnosed appellant's condition as antisocial personality, severe, with schizoid trends, which indicated the likelihood of psychotic episodes in the future. Dr. Sauer testified that while he was aware of the literature pertaining to the extra Y chromosome, he made no study of appellant in this connection since he believed that if such genetic defect existed, it was not a "mental defect" within the contemplation of

Section 9(a), but a physical defect, not affecting the mental functioning of the brain.

At the conclusion of Dr. Sauer's testimony, the trial judge ruled that he was not persuaded that reasonable minds could differ as to appellant's sanity; that the appellant's defect was physical and not mental; and that Dr. Jacobson's testimony did not, with reasonable medical certainty, overcome the presumption that appellant was sane. The trial judge thus declined to submit the issue of appellant's sanity to the jury. The jury subsequently found appellant guilty of robbery with a deadly weapon and he was sentenced to eighteen years under the jurisdiction of the Department of Correction.

We see no merit in appellant's contention on appeal that the trial judge erred in ruling that there had not been presented evidence of insanity under Article 59, Section 9(a) sufficient to overcome the presumption of sanity. Dr. Jacobson's testimony, if believed, clearly established that appellant possessed an extra Y chromosome (XYY) and that he was therefore genetically abnormal. It also tended to show in a general way that appellant's possession of the extra Y chromosome caused him to be antisocial, aggressive, in continual conflict with the law, and to have a "propensity" toward the commission of crime. But, as we pointed out in *Saul v. State, supra,* at page 549, and *Greenleaf v. State,* 7 Md. App. 575, 577-578, the test of responsibility for criminal conduct under Section 9(a) is predicated upon "mental disease or defect," the existence of which is "first and foremost a medical problem;" and that an opinion as to the ultimate fact whether an accused is insane under Section 9(a) should be reached "by a medical diagnosis," based on "reasonable medical certainty." The mere fact then that appellant had a genetic abnormality which Dr. Jacobson characterized as "a mental defect" would not, of itself, suffice to show that, under Section 9(a), he lacked, because of such defect, "substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." And to simply state

that persons having the extra Y chromosome are prone to aggressiveness, are antisocial, and continually run afoul of the criminal laws, is hardly sufficient to rebut the presumption of sanity and show the requisite lack of "substantial capacity" under Section 9(a). Moreover, we think it entirely plain from the record that in testifying that appellant had a "mental defect," Dr. Jacobson did so only in a most general sense, without full appreciation for the meaning of the term as used in Section 9(a), and particularly without an understanding that such term expressly excludes "an abnormality manifested only by repeated criminal or otherwise antisocial conduct." But even if it were accepted that appellant had a "mental defect" within the contemplation of Section 9(a), Dr. Jacobson, by his own testimony, indicated an inability to meaningfully relate the effect of such defect to the "substantial capacity" requirements of the subsection. Not only did Dr. Jacobson candidly admit that he had "no competence" in the field of psychiatry, but he demonstrated that fact by showing that he had not theretofore familiarized himself with the substance of Section 9(a); indeed, his conception of the test of criminal responsibility in Maryland was shallow at best, at least until the test was read to him during his testimony. While Dr. Jacobson did ultimately testify in conclusory fashion that he thought appellant insane and even incompetent to stand trial, his testimony in this connection was obviously predicated on a definition of "insanity" different than that prescribed under Section 9(a)—a definition so general as to encompass as insane a person who would attempt suicide. At one point in his testimony Dr. Jacobson conceded that he had "insufficient evidence" upon which to conclude whether appellant appreciated the "consequences of his actions." Whether this concession was due to the fact that Dr. Jacobson had never subjected appellant to a psychiatric examination is unclear; what is clear is that Dr. Jacobson's testimony was too generalized and lacking in specifics to form the basis for an opinion, with reasonable medical certainty, that ap-

pellant was insane under Section 9(a). In so concluding, we do not intend to hold, as a matter of law, that a defense of insanity based upon the so-called XYY genetic defect is beyond the pale of proof under Section 9(a).[1] We only conclude that on the record before us the trial judge properly declined to permit the case to go to the jury—a determination which, contrary to appellant's further contention, is not violative of any of his constitutional rights, state or federal. See *McCracken v. State, supra.*[2]

That the trial judge considered Dr. Jacobson as an expert witness on the issue of appellant's sanity appears clear, not because he was a qualified geneticist, but because he was, in addition, a medical doctor. Of course, whether a witness is qualified to express an opinion on the subject as to which he is called to testify is a matter for the trial court to pass upon in the first instance. *Hewitt v. Board of Motion Picture Censors,* 243 Md. 574. It has been held that the testimony of a physician is generally admissible on a question of mental condition or capacity, including sanity or insanity, at least where it appears that he is competent to give his opinion in the sense that he has either a general knowledge as a practicing physician or specialized training upon the subject. See Anno. 54 A.L.R. 860—"Competency of Physician or Surgeon as an Expert Witness as Affected by the Fact that he is not a Specialist;" 2 Wharton's *Criminal Evidence* (12th Edition) Section 508; 23 C.J.S. *Criminal Law,* Section 867 (c). It would thus appear that a physician's qualifications to express an opinion as to sanity under Section 9(a) is dependent upon the facts; he is not disqualified from being a competent medical witness

1. See "The XYY Chromosome Defense," Volume 57, No. 4, Georgetown Law Journal, pp. 892-922—a truly excellent, in-depth article dealing with this issue.

2. It is not contended that the trial judge erred in permitting the State to rebut Dr. Jacobson's testimony before making his preliminary ruling whether appellant had adduced competent medical evidence sufficient to overcome the presumption of sanity. If it were error, it was harmless under the circumstances of this case.

merely because he does not specialize in the field of psychiatry.[3]

That Dr. Jacobson was a well qualified geneticist was clear beyond question. Equally clear is the fact that he was not a practicing physician, and his experience in mental illness was related essentially to his practice in the field of genetics. He conceded a lack of competence in the field of psychiatry, admitted having no prior familiarity with the provisions of Section 9(a), had not subjected appellant to any psychiatric examination, and defined "insanity" in terms different than those prescribed by the applicable law. As we said in *Greenleaf v. State, supra,* to constitute proof of insanity sufficient to raise a doubt in the minds of reasonable men, competent medical evidence must be adduced to the positive effect that the accused, as a result of mental disease or defect, lacked substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law; and evidence of some undefined mental disorder or instability is insufficient proof to overcome the presumption of sanity. On the record before us, we think Dr. Jacobson's opinion as to appellant's sanity under Section 9(a) was not competent in that it was not based on reasonable medical certainty, and that the trial judge, had he so concluded, would not have been in error.

*Judgment affirmed.*

---

3. In *Saul,* we held that an opinion as to whether an accused is insane under Section 9(a) must be reached by a medical diagnosis made by a medically trained psychiatrist to be admissible in evidence. That statement was made in the context of the issue presented in *Saul, viz.,* whether a clinical psychologist should be permitted to express his expert opinion on the ultimate issue of sanity under Section 9(a). We there concluded that a psychologist could not express such an opinion, but we did not mean to lay down a flat rule that only a physician specializing in the practice of psychiatry could be considered as a competent expert witness.