419 A.2d 523

**COMMONWEALTH of Pennsylvania**

**v.**

**Richard G. YOUNG, Jr., Appellant.**

Superior Court of Pennsylvania.

Submitted March 23, 1979.

Filed March 21, 1980.

410

Thomas G. Klingensmith, Assistant Public Defender, Lancaster, for appellant.

Ronald L. Buckwalter, District Attorney, Lancaster, for Commonwealth, appellee.

Before CERCONE, President Judge, and WATKINS and HOFFMAN, JJ.

WATKINS, Judge:

This is an appeal from the judgment of sentence of the Court of Common Pleas of Lancaster County, Criminal Division, by the defendant–appellant, Richard G. Young, Jr., after conviction non–jury of kidnapping, robbery, theft by unlawful taking or disposition, burglary, firearms not to be carried without a license, and unlawful restraint; and from the denial of post–trial motions. He was sentenced to a term of imprisonment for not less than four (4) years or more than eight (8) years on one count of kidnapping; on the other charges of kidnapping, robbery and burglary he was sentenced to four (4) years concurrent probation; on the charge of theft he was sentenced to three (3) years concurrent probation and on the restraint and firearms convictions, to one (1) year concurrent probation and the costs of prosecution.

The only issue raised on appeal is whether the Commonwealth sustained its burden in proving that the appellant was sane beyond a reasonable doubt at the time he committed the crimes for which he was found guilty. The facts as related by the appellant and adopted by the Commonwealth are as follows:

On November 3, 1976, at about 10:15 P.M., a Mrs. Kathleen M. Shirker was just reporting for duty as a Nurse's Aide at the Brethern Home Village, in Neffsville, Pennsylvania. She noticed a person follow her inside as she entered the rear entrance from the parking area. He had a green ski cap pulled over his face with only slits for eyes. He approached her with a knife displayed, telling her he wouldn't hurt her if she didn't scream.

He then asked if she knew his girlfriend but he would not give any name of the girlfriend. He ordered her out to her car at knifepoint. He also momentarily displayed a gun and a rope.

At the car she was ordered to drive and he got in the back seat. He asked if she had a purse which she handed to him. He pulled out several items (compact, wallet), asking what

they were. She told him. He then asked if she had any car keys. She said they were in the purse. He looked for them, but being unable to find them, he demanded that she find them and returned the purse to her.

As they drove very little conversation took place. She was told to drive to Lititz. As she drove he inquired as to a location of a phone. He then inquired as to what color underpanties she had on. He insisted on being told the color. Shortly thereafter he told her to turn off the main road to a secondary road. She ignored that and drove straight into Lititz. He made no objection to that.

In the center of town she stopped for a red light, jumped out and started screaming while running for the police station. The purse and wallet were left in the car.

The male drove off at a fast rate of speed.

On cross examination it was disclosed that the male displayed the knife throughout the entire incident. When Mrs. Shirker asked him for his girlfriend's name he said nothing but merely stood there. When he ordered her to the car he gave no indication of destination, purpose or intent. His voice was natural, no fluctuation or emotion. He gave no indication, throughout, of excitement or fear; all of the items he pulled from the purse were normal types of ladies articles found in any store. After he was told what they were he put them back into the purse.

After capture, when interviewed by the detective, he said he did not want to hurt anyone, that he did not know why he asked what color panties she had on and that he was looking through her purse to see if she had a knife.

He said he had originally taken the gun (his brother's) and the knife with him from her home, because there were people out to get him due to certain types of letters he had recently been writing.

When one of the detectives had asked appellant what he would have done had Mrs. Shirker made the turn off the main road, as he had asked her to do, he said he would have talked to her about sex.

The appellant did not know why he originally drove to the general area of the Brethern Home. He initially drove around his high school before going to the Brethern Home.

After the incident he drove from Lititz back to the Brethern Home to get the car in which he originally came. However, finding it disabled, and thinking it to be booby trapped, he continued driving in Mrs. Shirker's car.

Not having anything in mind, appellant then drove into Lancaster City and drove around the city for a while. He then went to St. Joseph's Hospital, again not having anything in mind. Appellant entered the unlocked door near the rear of the hospital which was near the place where construction was underway. He entered on November 4, 1976 at about 1:00 A.M.

The head of security for St. Joseph's Hospital, Kenneth Ochs, indicated that at that time, the hospital was not open to the public since visiting hours were from 11:00 A.M. to 9:00 P.M. at the most. He indicated all doors were locked except for the Emergency Room door and that anyone desiring access to an area other than the Emergency Room, past normal visiting hours, should have been escorted by hospital staff. However, he did indicate that the Emergency Room area is not locked off from the other portions of the hospital.

In the hospital the second floor night supervisor, Mrs. Constance Allison, a nurse came into contact with appellant in an enclosed stairwell. She asked what he desired. He said he was looking for someone, pulled out a knife, told her he wasn't going to hurt her, and said he was looking for a nurse named Mary Ann (or Marian). He then put a ski mask on and warned Mrs. Allison that since she saw his face he knew all her usual activities and he would always be there.

He then questioned Mrs. Allison as to the layout of the floor and who was around. He then asked where her heart was, put his ear to her chest to listen to her heart, and told her her heart was beating fast.

They then proceeded down a hallway to a patient's room where he saw two other nurses. He made all three go back to the stairwell with him where he then asked all three about his nurse friend named Marian. He then talked of leaving and informed them that one would have to accompany him out of the hospital. He promised that the person would only be taken about two blocks. He would then call the other two to make sure they did not call the police. At that time the third would be released by him.

On cross examination Mrs. Allison said that appellant never threatened her with harm but for the initial warning to her when he donned the ski mask.

Appellant indicated the reason for wanting a hostage was because he thought the police would be looking for him and he wanted a safe exit.

Throughout the entire incident appellant showed no excitement.

Ms. Janice Eshleman, a P.L.N. at St. Joseph's Hospital, indicated that what Mrs. Allison testified to (as to the facts pertaining to the time all three nurses were together) was true and correct. She added that while in the stairwell, trying to decide which nurse was to be the hostage, that appellant put his hand to her face, and, asked her if she trusted him. She then noticed a small handgun in his hand next to her face. He then put the gun back in his pocket. Ms. Eshleman was 23 years old and was attractive, whereas the other two nurses were in their forties.

Mrs. Jane Nightingale then testified that she, as R.N., was on duty at the time of the incident and was the hostage that accompanied the appellant out of the hospital. Once out of the hospital proper, he put masking tape over her eyes. They then got into the car. She was on the passenger side.

Mrs. Nightingale stated that she believes appellant did then intend to stop at a phone booth and to then let her go. A short distance from the phone booth they came to a stop and she could hear some other person talking in a phone booth. Appellant said that phone was in use and began to

drive away. Very soon appellant said he thought the police were following him and a long high speed chase ensued. Appellant's car was finally brought to a stop by shooting the car tires out. Halfway through the chase the appellant took the tape from her eyes.

At no time did the appellant indicate to her that he was going to do any harm to her.

Detective Geesey, of the Lancaster City Police Department, indicated that he interviewed the appellant at 5:40 A.M. on November 4, 1976. Appellant was advised of his Warnings and the detective testified that the appellant understood them and that the appellant gave a general background history of himself.

According to the detective the appellant stated that he did not want to hurt anybody and only wanted to talk to the nurse. That after leaving the hospital, when appellant saw the police, he ran from the police because of too much pressure. The appellant gave the detective a fairly good summary of all of the facts of what occurred in these incidents.

According to Detective Ronald L. Savage of the Manheim Police Department, the appellant told him that he does not know why he had originally taken the rope with him when he left his home on November 3, 1976. But the appellant said he would have used the rope to tie Mrs. Shirker up if she resisted, so that she would have to stay while he talked to her.

■ The standard for sanity in Pennsylvania is still the two–pronged McNaughton test. There must be evidence in the case from whatever source that the appellant did not know the nature and quality of his acts or that he did not know that they were wrong. *Commonwealth v. Hamilton*, 459 Pa. 304, 329 A.2d 212 (1974). Once the issue is raised the Commonwealth has the burden of proving sanity beyond a reasonable doubt which can be established by lay witnesses. *Commonwealth v. Demmitt*, 456 Pa. 475, 321 A.2d 627 (1974).

■ In the instant case the Commonwealth relied on the opinions of lay witnesses to establish that the appellant was sane at the time of the crimes. A lay person or non expert may express general opinions as to mental capacity of appellant if he states facts and observations upon which his opinion is based and if facts and observations are reasonably related in time and circumstances to time period for which sanity is at issue. *Commonwealth v. Knight,* 469 Pa. 57, 364 A.2d 902 (1976).

Six lay witnesses testified concerning the behavior of the appellant. Four were victims of the crimes. They all agreed that the appellant knew what he was doing and knew his actions were wrong.

■ Appellant offered the testimony of two psychiatrists to support the claim that the appellant was insane at the time of the crimes. Both testified that he suffered from paranoid schizophrenia; that he couldn't distinguish between right and wrong. The trial court below found that although there was evidence that the defendant may have been emotionally disturbed, as trier of fact, he found him sane under the McNaughton test. In *Commonwealth v. Demmitt,* supra, the defendant relied on the testimony of a psychiatrist from a Commonwealth institution and the Commonwealth relied on lay witnesses. There is a distinct similarity between *Demmitt,* supra and the instant case. See also, *Commonwealth v. Zlatovich,* 440 Pa. 388, 269 A.2d 469 (1970).

The court below discussed the testimony of the six witnesses as follows:

"Four (4) of the witnesses (Janice Eshleman, Constance Allison, Jane Nightingale and Kathleen Shirker) were the victims of the crimes committed by the defendant. These women all agreed that the defendant knew what he was doing and knew that his actions were wrong.

"In order to describe the defendant's behavior the women used the following phrases:

"(a) Constance Allison–described items the defendant carried with him and then said, '. . . to me this indicated that he knew that he was going to do something wrong and wanted to be prepared in case things went wrong.'

(b) Janice Eshleman–'The way he just said if he didn't take someone with him we'd call the police and he'd be in a lot of trouble.'

(c) Jane Nightingale–'He didn't want us to call the police. He figured he must have done something wrong to worry about the police.'

(d) Kathleen Shirker–'I think the fact that he remained calm during the whole episode indicated that he knew what he was doing.'

"The other two witness were the detectives who interviewed the defendant the night of the kidnapping and both stated that the defendant knew what he was doing at the time of the interviews a few hours after he committed the crimes.

"Detective Geesey stated, 'I base my opinion on the fact that he was worried about the police, that he was worried that the police would find him and apprehend him. Also the fact that what turned out to be true, items he had with him, he brought these items from his home earlier that evening. In other words, he didn't pick them up along the way, he brought the gun from his grandparents' home, he brought the rope from his grandparents' home and the mask was homemade by himself.'

"Detective Savage stated that he was, 'Very calm, cool, responsive to our questions, answered our questions immediately, his answers made sense. He was very coherent, he was aware of his surroundings and aware of what he was in our police station for, aware of the nature of the offense.'"

■ It seems clear that the law in Pennsylvania is that evidence of lay witnesses alone can be sufficient to establish the sanity of a defendant who has offered expert testimony as to his insanity. *Commonwealth v. Zlatovich*, supra. The

418

Commonwealth may meet its burden by testimony concerning the defendant's actions, conversations, and statements at the time of the crimes from which the jury can infer that he knew what he was doing when he committed the crimes and that he knew that his actions were wrong. *Commonwealth v. Demmitt*, supra.

Judgment of sentence affirmed.

CERCONE, President Judge, and HOFFMAN, J., concur in the result.