**The PEOPLE of the State of Colorado, Plaintiff-Appellant,**

**v.**

**Michael Joseph WRIGHT, Defendant-Appellee.**

**No. 80SA256.**

Supreme Court of Colorado, En Banc.

July 26, 1982.

John Anderson, Special Deputy Dist. Atty., Dennis Faulk, Deputy Dist. Atty., Colorado Springs, for plaintiff-appellant.

J. Gregory Walta, Colorado State Public Defender, Susan L. Fralick, Deputy State Public Defender, Denver, for defendant-appellee.

LEE, Justice.

The defendant, Michael Joseph Wright, was charged with the first degree murder of a child, and he entered a plea of not guilty by reason of insanity. After a trial to the court on the issue of the defendant's sanity, the court entered its order finding the defendant not guilty by reason of insanity. The People bring this appeal of the judgment,[1] arguing that the evidence was insufficient, as a matter of law, to support the trial court's finding of insanity, and that the court improperly considered evidence that the defendant suffered from a minimal brain dysfunction in reaching the conclusion that the defendant was insane. We affirm the judgment.

On the night of July 3, 1979, the defendant was staying in the home of his parents along with his girlfriend, Neva, and her five-month old infant. Neva bathed the infant and put him to bed, then went to bed herself, while the defendant stayed up watching television. In the early morning hours of July 4 the defendant awoke Neva and asked her where the flashlight was, telling her he thought he heard prowlers outside. He took the flashlight and went out of the house for about twenty minutes. He came back in and engaged in sexual relations with Neva before both fell asleep. The next morning Neva realized that her son was not in his crib. She searched the house and asked the defendant if he knew where the child was. He denied any knowledge of his whereabouts but did not seem concerned. Neva first called relatives and then the police. The defendant sat passively in the house while searchers looked for the child.

The searchers noted that several holes had been recently dug in the field behind the house. The child's body was found buried a short distance from the house. The defendant was questioned by police and eventually confessed to the killing. He described how he had given the baby a bottle of antifreeze to drink, but the child had spit it out. He then took the child into the yard and buried him alive. He later apparently attempted to save the child, but his efforts were too late as the child had already suffocated. He then reburied the child.

The defendant had a history of problems concerning the child. About a week preceding the homicide he took the child for a walk, but returned to the house with the child soaking wet. He told Neva that he had accidentally dropped the child in the creek when he walked across a log bridge. He later admitted that he had attempted to drown the child, but had saved him in time, fearing the wrath of Neva's father should anything happen to the baby. On another occasion he seized the child and refused to give him to his mother when Neva threatened to leave him after an argument. Police were summoned before he finally relinquished the child. On the afternoon prior to the homicide the defendant became angry when he learned that his sister's boyfriend had opened a savings account for the child without his knowledge.

---

1. Section 16–12–102, C.R.S.1973 (1978 Repl. Vol. 8), creates a right of appeal in the prosecution regarding any question of law in a criminal case.

After his arrest and incarceration awaiting trial, the defendant repeatedly attempted to contact Neva and wrote to her asking if she still wished to have a baby with him. To the examining psychiatrists he explained that he would be let out of jail if he told his lawyer that he would not do bad things anymore. He expressed his belief that he and Neva could be closer with the child out of the way.

## I.

Every criminal defendant is presumed sane, but once any evidence of insanity is introduced at trial, the burden of proof is on the People to prove sanity beyond a reasonable doubt. *People v. Ware*, 187 Colo. 28, 528 P.2d 224 (1974); *People ex rel. Juhan v. District Court*, 165 Colo. 253, 439 P.2d 741 (1968).[2] When evidence of sanity is in dispute, the fact-finder must resolve the conflict in the testimony, and weigh all relevant evidence to determine whether the defendant was legally insane at the time of the act. One who is legally insane at the time of the commission of the act which would otherwise be criminal, is not criminally accountable and is excused from punishment. *See* section 18–1–802, C.R.S.1973 (1978 Repl.Vol. 8).

Both the prosecution and the defense presented considerable evidence regarding the defendant's mental state at the time of the commission of the crime. The People called three psychiatrists, one neurologist, and one psychologist, all of whom concluded that the defendant was sane.

The defendant's cell-mate testified that the defendant had confided to him that he had tricked the doctors into thinking he was insane. The defendant allegedly wished to appear insane so that he would be sent to the state hospital rather than to prison in the hope that he would get out sooner. The experts presented by the prosecution agreed that they thought the defendant was malingering and trying to appear insane to avoid punishment.

The defense presented testimony of experts to the effect that the defendant suffered from minimal brain dysfunction and that he was insane according to the legal definition. Dr. Cole, an expert in forensic psychiatry, testified that the defendant had a "disease or defect of the mind which [rendered] him incapable of distinguishing right from wrong or adhering to the right at the time of the crime." This opinion was developed by relying on the defendant's history, reports of other experts, and personal interviews with the defendant over approximately four and one-half hours. Dr. Cole related the defendant's belief that he would improve his relationship with the child's mother by disposing of the child. He described how the defendant wrote to the child's mother from prison in the apparent belief that their relationship would be ongoing, asking if she would wish to have another child with him. Dr. Cole testified that the defendant suffered from an organic brain syndrome with a psychosis, and as a result he had poor impulse control. This condition was manifested in the defendant's tendency to overreact to irritating forces by striking out in a rage rather than inhibiting his anger more reasonably.

In addition, the defense offered the testimony of Dr. Coutts, a psychologist specializing in neuropsychology. Dr. Coutts testified that the defendant suffered from minimal brain dysfunction, a condition that results when neurotransmitters in the brain

---

2. Legal insanity is defined at section 16–8–101, C.R.S.1973, as follows:

"The applicable test of insanity shall be, and the jury shall be so instructed: 'A person who is so diseased or defective in mind at the time of the commission of the act as to be incapable of distinguishing right from wrong with respect to that act, or being able so to distinguish, has suffered such an impairment of mind by disease or defect as to destroy the willpower and render him incapable of choos-

ing the right and refraining from doing the wrong is not accountable; and this is so howsoever such insanity may be manifested, by irresistible impulse or otherwise. But care should be taken not to confuse such mental disease or defect with moral obliquity, mental depravity, or passion growing out of anger, revenge, hatred, or other motives, and kindred evil conditions, for when the act is induced by any of these causes, the person is accountable to the law.' "

do not function normally. As he described it, neurotransmitters such as norepinephrine and seratonin activate "switches" in the brain's "inhibitory command post" to "either turn on or shut off whole behavior." When a person suffers from minimal brain dysfunction, his neurochemical responses do not act properly, either preventing inhibitory cells from turning off or allowing too many excitory cells to turn on. Dr. Coutts testified in terms of the decision-making process of the defendant, stating that the defendant's willpower was destroyed and that his mind was impaired by disease or defect so as to render him incapable of refraining from the wrong and choosing the right.

After hearing all testimony on the issue of the defendant's sanity, the court concluded ·that the prosecution had failed to prove sanity beyond a reasonable doubt. The court did not find that the defendant suffered from an organic brain syndrome. However, the court was of the opinion that the defendant's comprehension of reality was too distorted for him to be held legally accountable for his criminal conduct.

■■■ Where expert testimony is in conflict, the resolution of the conflict and the weight to be given to the testimony is solely the province of the trier of fact. *People v. Lowe*, 184 Colo. 182, 519 P.2d 344 (1974). The question of sanity in a criminal case is an issue of fact to be determined by the trier of fact, in this case the trial judge. *Henderson v. People*, 156 Colo. 229, 397 P.2d 872 (1965); *People v. Haines*, 37 Colo.App. 302, 549 P.2d 786 (1976); *see also People v. Ware, supra; Gomez v. District Court*, 179 Colo. 299, 500 P.2d 134 (1972). On review of this record, we find no prejudicial error which would warrant our reversal of the trial court's factual determination.

## II.

Even though the court did not base its conclusion of legal insanity on a finding that the defendant suffered from an organic brain syndrome, nevertheless, the People argue that the testimony concerning minimal brain dysfunction, also known as organic brain syndrome, should not have been admitted or considered by the trial court in determining whether the defendant suffered from a "mental disease or defect" within the meaning of the statute. The People contend such evidence is unreliable and is not relevant to the issue of sanity.

The People analogize the presence of minimal brain dysfunction to the presence of XYY chromosomal deficiency, which has been rejected as an indication of insanity by other courts. *See, People v. Tanner*, 13 Cal.App.3d 596, 91 Cal.Rptr. 656, 42 A.L. R.3d 1408 (1970). Evidence of XYY chromosomal deficiency has been excluded as irrelevant on the basis that the studies on the subject are inconclusive on the issue of insanity or aggressive behavior as a result of the syndrome, and that not all those who possess the XYY chromosome make-up are involuntarily aggressive. *See People v. Tanner, supra; see also People v. Yukl*, 83 Misc.2d 364, 372 N.Y.S.2d 313 (1975); *Millard v. State*, 8 Md.App. 419, 261 A.2d 227 (1970). We find the People's analogy inapposite.

In this case the expert witnesses, who were qualified without objection, testified that the defendant suffered from a psychosis as well as an organic brain syndrome. Moreover, the prosecution stipulated at trial that the defendant suffered from minimal brain dysfunction. Both defense experts testified that the defendant's minimal brain dysfunction resulted in poor impulse control, and that the defendant was incapable of choosing the right and refraining from doing the wrong.

■■ Traditionally, the scope of evidence admissible on the issue of insanity is broad. Even lay persons are free to testify as to the sanity of a defendant if a proper foundation is presented. *See* section 16–8–109, C.R.S.1973 (1978 Repl.Vol. 8); *People v. Medina*, 185 Colo. 101, 521 P.2d 1257 (1974); *Rupert v. People*, 163 Colo. 219, 429 P.2d 276 (1967). As we stated in *People v. Trujillo*, 150 Colo. 235, 238, 372 P.2d 86, 88 (1962):

"A much wider area of conduct on the part of a defendant can be made the subject of inquiry in a trial relating to his sanity, than would be permissible in a trial upon a plea of not guilty. Any abnormal conduct, whether related to the act forming the basis of the accusation or not, may be relevant and important on the issue of his mental condition. Conversely, evidence of normal conduct, and actions reflecting the usual and ordinary under the circumstances, may be shown to prove sanity."

Section 16–8–107(2), C.R.S.1973 (1978 Repl.Vol. 8), also indicates the scope of admissibility of expert testimony in an insanity trial. That subsection provides:

"(2) In any trial or hearing concerning the defendant's mental condition, physicians and other experts may testify as to their conclusions reached from their examination of hospital records, laboratory reports, x-rays, electroencephalograms, and psychological test results if the material which they examined in reaching their conclusions is produced at the time of the trial or hearing."

■ The expert testimony concerning the psychological testing of the defendant, the results of the tests, the nature of the condition of minimal brain dysfunction, its relation to poor impulse control and lack of willpower, was clearly admissible in evidence and relevant to the issue of the defendant's sanity. The People have not demonstrated that the court erred in admitting such evidence.

Judgment is affirmed.