2015 COA 150

**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

v.

**Bruco Strong Eagle EASTWOOD, Defendant–Appellant.**

**Court of Appeals No. 11CA2592**

Colorado Court of Appeals, Div. IV.

Announced October 22, 2015

Rehearing Denied November 19, 2015

trial where Roalstad must be allowed to present her case to a jury pursuant to section 16–10–109.

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24–51–1105, C.R.S.2015.

Cynthia H. Coffman, Attorney General, John T. Lee, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Douglas K. Wilson, Colorado State Public Defender, James S. Hardy, Deputy State Public Defender, Denver, Colorado, for Defendant–Appellant.

Opinion by JUDGE ROMÁN

¶ 1 On February 23, 2010, defendant, Bruco Strong Eagle Eastwood, took a loaded rifle to Deer Creek Middle School where he shot and injured two students. A jury found him not guilty by reason of insanity (NGRI) on ten of eleven counts but guilty of unlawful possession of a weapon on school grounds. Defendant asserts he should have been found NGRI on that count as well. We conclude that defendant's conviction for unlawful possession of a weapon on school grounds is

supported by substantial and sufficient evidence, and affirm.

## I. Background

¶ 2 On the day of the shooting, defendant took his father's rifle and drove to a sporting goods store. There, defendant conversed with the store clerk about a type of ammunition that he (mistakenly) thought was on sale. He ended up purchasing a different type of ammunition on sale. After that, he stopped for lunch at a fast food restaurant and then drove to the middle school he had attended twenty years earlier.

¶ 3 Once at the school, defendant parked across the street, but later moved his car to the school parking lot after a sheriff's patrol car left the premises. He proceeded into the building and was advised by a custodian that he needed to go to the office. In the office, defendant had a five to ten minute conversation with the secretary. During the conversation, defendant said he wanted to see the new wing of the building, asked about certain teachers he had known, and responded to the secretary's questions about where he had attended high school. Defendant signed in to receive a visitor's badge and waited for school to let out, at which time he would be allowed to see the new wing.

¶ 4 Defendant then spent a few more minutes looking at plaques on the wall. He asked a custodian passing through the office whether the custodian had gone to school there, and when the custodian responded that he had not, defendant did not pursue the conversation.

¶ 5 School was still in session, so defendant went back outside and asked a group of students whether they attended the school. They answered that they did not, but instead attended a school located across the street from a prison. Defendant joked about the children being "bad" because they attended a "prison school."

¶ 6 Returning to his car, defendant retrieved his rifle and re-approached the school. Because school was now over for the day, students were leaving the building. Defendant asked another group of students whether they went to the middle school and one of them answered yes. Defendant then announced they were all going to die and fired a shot from his rifle, hitting a student. He reloaded his rifle and fired again, hitting another student. At that point, a teacher tackled and disarmed defendant, and another one helped subdue and restrain him.

¶ 7 Law enforcement officials took defendant into custody. Although he initially resisted the officers, defendant eventually calmed down and complied with their requests and orders. That evening, two investigators interviewed defendant at the sheriff's office for several hours.

¶ 8 The People charged defendant with four counts of attempted murder, four counts of first degree assault, two counts of child abuse resulting in serious bodily injury, and unlawful possession of a weapon on school grounds. The complaint also alleged four counts of crime of violence sentence enhancers related to the attempted murder charges.

¶ 9 Defendant pled not guilty by reason of insanity. At trial, three psychiatrists—Dr. Richard Martinez, Dr. Hal Wortzel, and Dr. Karen Fukutaki—opined that defendant was insane—that is, he was unable to appreciate the wrongfulness of his conduct—when he fired the shots. Specifically, the psychiatrists testified that defendant suffered from schizophrenia with symptoms including delusions, hallucinations, and disorganized thinking.

¶ 10 According to the psychiatrists, defendant began experiencing symptoms in 2002, believing that a Nielsen rating box installed in his apartment was trying to control his thoughts. He was hospitalized and diagnosed with schizophreniform disorder but did not continue taking the prescribed anti-psychotic medication after his release. Defendant went untreated for the next eight years and came to believe he was being invaded and attacked by "mutants" and "loser bugs" that were trying to "transform" and devour him. His journals showed that he was "totally consumed" with the "mutants," including, for example, the belief that they were trying to kill him with noise and poison and were

trying to invade his body.[1]

¶ 11 However, a fourth psychiatrist, Dr. Steven Pitt, declined to opine regarding defendant's ability to distinguish right from wrong. Instead, Dr. Pitt outlined "several key pieces of behavioral evidence [which suggested] that despite having a mental disease or defect, [defendant] was able to distinguish right from wrong."

¶ 12 The People called over three dozen witnesses. Some described their interactions with defendant on the day of the shooting and his demeanor before the shooting, including defendant's encounters at the fast food restaurant and sporting goods store. Other witnesses described their observations as defendant carried out the shooting. Still other witnesses described their interactions with defendant and his demeanor after the shooting. Finally, defense witnesses described defendant's troubled upbringing and a long, untreated course of mental illness.

¶ 13 Defendant moved for judgment notwithstanding the verdict on the weapon possession charge.[2] In a carefully reasoned order, the trial court orally denied the motion, finding as follows:

The evidence from the qualified professionals was overwhelming that the defendant was insane at the time that he shot these children, and the jury found that in their verdict and it was well justified by the evidence.

But the jury was very careful and looked at every one of these charges individually as I had instructed them to do. Some people wonder how can it be the case, that a person is responsible at one point and a couple hours later is not responsible.

Well, the defendant clearly suffers from paranoid schizophrenia. It is a grave psychological illness, and he will have it for the rest of his life.

But people who suffer from paranoid schizophrenia may be psychotic all the time, but that doesn't mean they are insane all the time.

They are insane only when their psychosis renders them in this circumstance incapable of distinguishing right from wrong as to a particular act.

Some people oversimplify this by saying that, well, sometimes their hallucinations and their delusions and their demons make them incapable from distinguishing right from wrong and sometimes they don't. While that is an oversimplification, it's one that is not without its uses.

The defendant is guilty of the offense that the jury found him guilty of, and the evidence of his guilt as to this charge in my view is again strong and will justify the jury's verdict.

The defendant took his father's gun without his father's permission from Hudson, Colorado, put it in the trunk of his car. Drove to the metro area. Went to a sporting goods store, where he had a very rational discussion with the clerk, bought ammunition, put that in the car too, and drove to Deer Creek school.

He was in possession of the gun that was in the trunk of his car. He drove that car on to school property and parked it in a school parking lot on school property.

He then went into the school where he spoke with members of the maintenance staff. He had rational, intelligent discussion with them. They told him he had to go to the office, and he had to register as a visitor and get a visitor tag. He went to the office. He had intelligent, rational discussion with the people in the office. He filled out their forms. He told them he'd gone to school there. He asked whether any of the teachers that he knew were still there. He told them that there was a new wing on the school that wasn't there when

---

1. Dr. Martinez testified that, at the time of the shooting, defendant's "planning and his decision-making was totally based on delusional thought, on a delusion in which he felt that his life was at risk, that he would die if he did not act this out in some way."

2. A person commits unlawful possession of a weapon on school grounds "if such person knowingly and unlawfully and without legal authority carries, brings, or has in such person's possession a deadly weapon ... in or on the real estate and all improvements erected thereon of any ... middle ... school." § 18–12–105.5(1), C.R.S. 2015.

he was there, and he asked if he could have a visitor's pass so he could go take a look at the new wing.

All of these were rational, intelligent behaviors. At the moment he was doing these things, at the time he was doing these things he was not being in control by demons or delusions. He was not incapable of distinguishing right from wrong at the time that he was doing these things, and it was a time when he brought a gun on the school property.

The jury is absolutely correct, he is guilty of this[.]

¶ 14 Defendant appeals only the guilty verdict of unlawful possession of a weapon on school grounds, arguing that the evidence was insufficient to permit the jury to conclude that he was sane when he committed this offense.

## II.  General Sufficiency of the Evidence Standards

¶ 15 Sufficiency of the evidence is a question of law we review de novo. *Clark v. People*, 232 P.3d 1287, 1291 (Colo.2010); *People v. Porter*, 2013 COA 130, ¶ 6, 353 P.3d 852, *rev'd on other grounds*, 2015 CO 34, 348 P.3d 922. We consider whether " 'the relevant evidence, both direct and circumstantial, when viewed as a whole and in the light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty of the charge beyond a reasonable doubt.' " *Clark*, 232 P.3d at 1291 (quoting *People v. Bennett*, 183 Colo. 125, 130, 515 P.2d 466, 469 (1973)); *see also Porter*, ¶ 6.

¶ 16 In applying this test, the prosecution is given the benefit of every reasonable inference that might fairly be drawn from the evidence. *People v. Esparza–Treto*, 282 P.3d 471, 475 (Colo.App.2011). Resolution of the weight and credibility of the evidence is entrusted to the jury, and an appellate court may not set aside a verdict merely because we might have drawn a different conclusion from the same evidence. *Id.* If "reasonable minds could differ, the evidence is sufficient to sustain a conviction." *People v. Robinson*, 226 P.3d 1145, 1154 (Colo.App.2009).

## III.  Insanity Defense

¶ 17 Insanity is an affirmative defense. *See* § 18–1–805, C.R.S. 2015; *People v. Voth*, 2013 CO 61, ¶ 34, 312 P.3d 144. "Every person is presumed to be sane; but, once any evidence of insanity is introduced, the people have the burden of proving sanity beyond a reasonable doubt." § 16–8–105.5(2), C.R.S. 2015.

¶ 18 As pertinent in this case, Colorado law provides that a person who meets the following test for insanity is not accountable for his crime: "[a] person who is so diseased or defective in mind at the time of the commission of the act as to be incapable of distinguishing right from wrong with respect to that act." § 16–8–101.5(1)(a), C.R.S. 2015.

¶ 19 The question of sanity is an issue of fact to be determined by the jury. *See People v. Wright*, 648 P.2d 665, 668 (Colo.1982). But "[t]he kind and quantity of evidence of sanity which the prosecution must produce to meet its burden and take the issue to the jury will vary in different cases," depending on the evidence of insanity offered by the defense. *People v. Ware*, 187 Colo. 28, 31, 528 P.2d 224, 226 (1974). At one end of the continuum, if there is no evidence of insanity, the prosecution need not offer any evidence of sanity. *Id.* To overcome token evidence of insanity, "[s]ome competent lay evidence of sanity may suffice." *Id.* at 32, 528 P.2d at 226. At the other end of the continuum, more evidence may be required "when the defendant's evidence of insanity is substantial." *Id.*

¶ 20 In resolving the issue of sanity when the evidence is in dispute, the jury "must resolve the conflict in the testimony, and weigh all relevant evidence to determine whether the defendant was legally insane at the time of the act." *Wright*, 648 P.2d at 667; *accord Porter*, ¶ 8. The jury is not bound by the testimony of psychiatric experts on the issue of sanity and is free to believe lay testimony over any other testimony. *Ware*, 187 Colo. at 33, 528 P.2d at 227; *see also Porter*, ¶ 13 (fact finder is free to accept or reject all or part of any expert's testimony).

## IV. Application

¶ 21 Defendant contends that the evidence was not sufficient for a jury to conclude that he was sane when he unlawfully possessed a weapon on school grounds. He argues that the lay testimony amounted to, at most, token evidence that he was sane while he was on school grounds prior to the shooting and was insufficient to overcome the evidence of his insanity, which included the testimony of three experts who opined that he was insane. We reject defendant's argument. Having reviewed the record, we conclude that the evidence of defendant's sanity as to the weapon possession charge—both lay and expert testimony—was substantial and sufficient to permit a reasonable juror to find that defendant was sane.

### A. Lay Testimony

¶ 22 As defendant acknowledges, a jury is entitled to disregard expert opinions of insanity in favor of lay testimony supporting a contrary conclusion. *See People v. King*, 181 Colo. 439, 444, 510 P.2d 333, 335 (1973), *abrogation on other grounds recognized by People v. Serravo*, 823 P.2d 128, 140–41 (Colo.1992); *see also Porter*, ¶ 13; *Commonwealth v. Chandler*, 29 Mass.App.Ct. 571, 563 N.E.2d 235, 242 (1990) (affirming verdict of guilty of unlawfully carrying a firearm despite jury finding of not guilty of murder by reason of insanity because "[t]he jury was not required to believe, in its entirety, the testimony of the defendant's expert (a psychiatrist) that the defendant's psychotic episode continued beyond the time when he buried the guns").

¶ 23 Here, the jury could have viewed the evidence as demonstrating that, before the shooting, defendant was able to rationally interact with the clerk at the sporting goods store, the restaurant employee, and staff members and children at the school. Several witnesses testified that they did not notice anything strange about defendant's behavior shortly before the shooting, and others testified that they did not notice anything strange about defendant's behavior shortly after the shooting.

¶ 24 Defendant's own statements, moreover, support the jury's conclusion that he could appreciate the wrongfulness of possessing a weapon on school property. For example, defendant told Dr. Wortzel that when he drove to the school he was smoking, and when he spotted a police car in the parking lot, he became afraid that he was going to get in trouble for smoking on school grounds.

### B. Expert Testimony

¶ 25 Despite the testimony of three psychiatrists that defendant was legally insane on the date of the incident, we find support for the jury's verdict in the expert testimony as well. The disputed issue was whether defendant was capable, at the time he committed the acts, of distinguishing right from wrong with respect to the criminal acts.[3] Significantly, the majority of charges arose from defendant firing his rifle and injuring the two students. The experts, too, focused their testimony on the few seconds during which the shots occurred.

- Dr. Martinez testified that "[J]ust because this man parrots [in the police interview] that yes, I knew right from wrong doesn't mean that at the time that he pulled the trigger he knew right from wrong."

- Dr. Wortzel testified, "We're not talking about whether or not [defendant's] delusions precluded him from knowing the rules of the road. We're talking about whether or not it [sic] precluded him from appreciating specifically what

---

3. We recognize all four psychiatrists agreed that defendant suffered from schizophrenia. But, as the defense experts explained, a clinical diagnosis of mental illness or psychosis does not equate to legal insanity, and a person who suffers from schizophrenia and is psychotic can often distinguish right from wrong. *See United States v. Coleman*, 501 F.2d 342, 346 (10th Cir.1974) (lay testimony of facts and observations of the defendant before and immediately after attempted hijacking of plane, to counter defense's expert psychiatric testimony on insanity, was sufficient to present the question to the jury because "the jury could well accept the fact that [the defendant] was abnormal and in need of psychiatric treatment, that his conduct was irrational in the sense of being 'muddled,' strange and disjointed[, but] the jury could also determine that [the defendant] had preplanned the piracy, knowing it to be wrong").

he did at [the school], firing that gun, shooting those children."

- Dr. Fukutaki testified, "I don't believe he was able to determine the wrongfulness and appreciate the wrongfulness of his actions at the time he shot the gun twice, and at the time that he is being taken down."

¶ 26 Whereas the charged crimes of attempted murder, assault, and child abuse resulting in injury were limited to the few seconds in which defendant fired his rifle, the weapon possession charge spanned a longer time period. Although, as defendant points out, none of the experts testified that his insanity was limited to the few moments when he fired the shots, they also did not specifically testify that he was incapable of distinguishing right from wrong with respect to possessing a gun on school property when he first arrived at the school. *See People v. Bielecki*, 964 P.2d 598, 605 (Colo.App.1998) (citing with approval cases from other jurisdictions holding that "a defendant may be found not guilty by reason of insanity or impaired mental condition as to one charge, and guilty as to other charges"); *Chandler*, 563 N.E.2d at 242 (affirming verdict of guilty of unlawfully carrying a firearm, despite jury finding of not guilty by reason of insanity of murder, because "[t]he jury was free to find from the evidence that the defendant was insane at the moment that he shot the victim but sane when, after the murder, he carried the guns home and, later, carried them to the woods and buried them").

¶ 27 Here, too, some of the experts' testimony supports the conclusion that, although defendant was insane when he fired the shots at the children, he was able to appreciate the wrongfulness of his conduct at other times that day.[4] Dr. Pitt testified that key pieces of behavioral evidence suggested that, on the day of the incident, defendant was able to distinguish right from wrong with respect to his conduct. Dr. Pitt provided five examples to the jury:

1. Defendant waited until a sheriff's deputy left the school grounds before he entered the school;

2. defendant entered the school before the shooting without his rifle;

3. defendant was directed to the front office in the school, where he spoke with the staff;

4. defendant secreted his rifle in the back of his vehicle when he was driving; and

5. defendant made several references indicating his appreciation of the wrongfulness of his conduct during the police interview.[5]

¶ 28 In our view, this case is similar to *Diestel v. Hines*, 506 F.3d 1249 (10th Cir. 2007). There, the Tenth Circuit concluded that evidence of sanity was sufficient despite the presentation of expert testimony of insanity and the lack of expert opinion that the defendant was sane. *Id.* at 1268–71. The court noted that "the state did not rely on lay witnesses alone. It called [a forensic psychologist] to give expert guidance to the jury; ... [that psychologist] focused on [the defendant's] state of mind at the time of the offense and provided the jury with a framework to use the lay testimony in reaching its conclusion regarding sanity." *Id.* at 1271. The psychologist in *Diestel* declined to give an opinion on whether the defendant was legally sane; nonetheless, the court concluded that this expert evidence, in conjunction with lay testimony describing the defendant's behavior before, during, and after the shooting, was sufficient to support the defendant's conviction. *Id.*

- Defendant's journal leading up to the offense was disorganized, nonsensical, and "consistent with someone that's seriously mentally ill";
- defendant made no attempt to wear a disguise or hide his identity;
- defendant signed into the school using his real name, not an alias; and
- defendant struggled to make sense of his actions.

---

4. Dr. Fukutaki testified that defendant was able to recognize the wrongfulness of his conduct during his interview with police, just two hours after the shooting; that there were indications of fluctuations in defendant's mental status during the police interview; and that defendant's psychosis could have been fluctuating all day.

5. We acknowledge that Dr. Pitt outlined examples that indicated defendant was *not* able to distinguish right from wrong as well, including:

¶ 29 We are persuaded that the evidence, when viewed as a whole and in the light most favorable to the prosecution, supports the jury's conclusion that defendant was sane when he brought· a weapon onto school grounds. *See Clark*, 232.P.3d at 1291; *King*, 181 Colo. at 441–42, 510 P.2d at 334–35 (evidence of the defendant's . behavior and demeanor during and immediately after crime as well as evidence of rational behavior and statements from the defendant shortly after crime was sufficient to send question of the defendant's sanity to the jury, even though the prosecution did not offer expert testimony to oppose testimony of two experts opining the defendant had been legally insane).

¶ 30 Conversely, we are not persuaded that this case is similar to *Ware*. In *Ware*, our supreme court found it "most significant" that the prosecution's evidence "went only to the commission of the act and to the surrounding circumstances." 187 Colo. at 32, 528 P.2d at 226. The prosecution's entire case-in-chief and rebuttal case "consisted of two eyewitnesses who testified that Ware was angry and upset[,] . . . the pathologist who examined the body of the victim," and testimony of the arresting officer (who had seen the defendant for about forty minutes) that the defendant "appeared substantially similar to others in his same situation." *Id.* at 30–31, 528 P.2d at 225–26.

¶ 31 Contrary to defendant's contention, the People's evidence in this case was much stronger than that in *Ware*. The evidence demonstrated that defendant was able to interact rationally with several people shortly before and shortly ·after he arrived at the school. In addition, several witnesses who had the opportunity to observe defendant did not notice anything troubling about his behavior and demeanor when he arrived at the school. And statements made by defendant allowed the jury to conclude that he could appreciate the wrongfulness of his actions when he arrived at the school. Moreover, the expert opinions of insanity did not specifically address the weapon possession offense, and some of the expert testimony supports a conclusion that defendant was able, at vari-

ous times on February 23, 2010, to appreciate the wrongfulness of his conduct.

¶ 32 We are also unpersuaded by defendant's reliance on *Wright v. United States*, 250 F.2d 4 (D.C.Cir.1957), and *People v. Murphy*, 416 Mich. 453,331 N.W.2d 152 (1982). Although the prosecution in those cases also did not offer conflicting expert testimony of sanity to counter expert psychiatric evidence of insanity,[6] the nonexpert testimony in those cases, consisting of observations and opinions of police officers who interacted with the defendants following the crimes, was less substantial than the evidence ·offered in this case. *See Wright*, 250 F.2d at 7–9; *Murphy*, 331 N.W.2d at 155–58; *compare Ware*, 187 Colo. at 32, 528 P.2d at 226–27 (two eyewitnesses testified that the defendant was angry and upset and arresting officer testified that the defendant "appeared ·substantially similar to others in his same situation"), *with ·Diestel*, 506 F.3d at 1251 ("The state called several witnesses who described [the defendant's] behavior before, during, and after the shooting. . . . [T]heir observations could form part of the basis of the opinions of others [about the defendant's sanity], including the jury."), *and Commonwealth v. Young*, 276 Pa.Super. 409, 419 A.2d 523, 527 (1980) (testimony of four kidnapping victims describing the defendant's behavior and reasoning that the defendant knew that his actions were wrong, in addition to two detectives who interviewed the defendant that night and testified that the defendant knew what he was doing at that time, was sufficient to support finding of sanity despite expert testimony of insanity). ·

¶ 33 In this case, although none of the experts specifically testified that defendant was sane when he showed up on school property with a weapon, one of the experts provided guidance to the jury on how to determine whether defendant was sane or insane. *See King*, 181 Colo. at 444, 510 P.2d at 335 (jury entitled to disregard expert opinions of insanity in favor of lay testimony); *Porter*, ¶ 13 (fact finder is free to accept or reject some or all of expert testimony).

6. In *People v. Murphy*, the prosecution's psychologist testified that the defendant was *insane* at the time of the crime. 416 Mich. 453, 331 N.W.2d 152, 156 (1982).

¶ 34 Taken together, the lay person and expert testimony was sufficient for the jury to conclude beyond a reasonable doubt that defendant was sane when he arrived at the school with a rifle, even if the jury was not convinced beyond a reasonable doubt that defendant was sane when he actually fired the shots later that afternoon. *See Ware*, 187 Colo. at 32, 528 P.2d at 226–27 (distinguishing presented testimony from that in *King*, in which "the lay testimony stressed the defendant's calmness, and how he appeared to make rational conversation and choices," and the testimony had been sufficient to send the issue of sanity to the jury); *see also Young*, 419 A.2d at 527 (Commonwealth could meet its burden to establish sanity in opposition to expert testimony of insanity with "testimony concerning the defendant's actions, conversations, and statements at the time of the crimes").

## V. Conclusion

¶ 35 The evidence supports the jury's verdict on the charge of unlawful possession of a weapon on school grounds. We will not substitute our judgment for the judgment of the jury. *See King*, 181 Colo. at 443, 510 P.2d at 335 ("[O]n the state of the record resolution of [the insanity] question was for the jury and not for the court."); *Robinson*, 226 P.3d at 1154. The judgment of conviction is affirmed.

Graham and Vogt *, JJ., concur