22CA2176 Peo v Garcia 10-17-2024

COLORADO COURT OF APPEALS

---

Court of Appeals No. 22CA2176
Adams County District Court No. 20CR3610
Honorable Robert W. Kiesnowski Jr., Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Reagan Christopher Garcia,

Defendant-Appellant.

---

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division V
Opinion by JUDGE GROVE
Freyre and Lum, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced October 17, 2024

---

Philip J. Weiser, Attorney General, Alejandro Sorg Gonzalez, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Krista A. Schelhaas, Alternate Defense Counsel, Littleton, Colorado, for Defendant-Appellant

¶ 1     Defendant, Reagan Christopher Garcia, appeals his convictions and sentence entered on guilty verdicts for two counts of stalking and four counts of violating protection orders.

¶ 2     Garcia raises two issues on appeal.[1]  First, he contends that the cumulative effect of improperly admitted prior bad acts evidence deprived him of a fair trial.  Second, he argues that even if we affirm his convictions, we should vacate his sentence and remand for resentencing.  We reject Garcia's contentions of trial error, but we agree he is entitled to a new sentencing hearing.  Consequently, we affirm Garcia's convictions, reverse his sentence, and remand the case for resentencing.

## I.     Background

¶ 3     The prosecution presented evidence at trial from which a reasonable jury could have found the following.

¶ 4     Garcia and D.Q. were married for seven years and had three children together.  They divorced in 2010.  Garcia's conduct during

---

[1] In his opening brief, Garcia argued that his convictions for stalking under section 18-3-602(1)(c), C.R.S. 2024, must be reversed because that statute is unconstitutional, citing *Counterman v. Colorado*, 600 U.S. 66 (2023).  Garcia withdrew this argument in his reply brief, so we do not address it on the merits.

and after the divorce resulted in four protection orders that were active during the relevant times. The protection orders required Garcia to not contact D.Q. and prohibited him from going near D.Q.'s residence.

¶ 5 Between July and November 2020, Garcia violated the protection orders many times. Some of these violations included leaving menacing voicemails, attempting to break into D.Q.'s residence multiple times while she and her family were inside, and threatening to murder and dismember D.Q. and members of her family.

¶ 6 Despite these incidents, D.Q. did, on a few occasions, voluntarily spend some time with Garcia during this period. Garcia hosted a birthday party for their son at his sister's house that D.Q. attended. D.Q. picked Garcia up from his sister's house and gave him rides a few times. D.Q. and Garcia went to a concert together, and D.Q. allowed Garcia to stay one night at her house. Regarding these interactions, D.Q. clarified that "99 percent of the time, we were not cordial."

¶ 7 Shortly after one of Garcia's attempts to break into D.Q.'s residence, Garcia was charged with one count of second degree

burglary, two counts of stalking, and ten counts of protection order violations. After a jury trial, he was convicted of both stalking counts and four of the protection order violations. The district court sentenced Garcia to a controlling sentence of eight years in the custody of the Department of Corrections.

## II.     Prior Bad Acts Evidence

¶ 8     Garcia contends that several references to prior criminality and other bad acts, when viewed cumulatively, deprived him of a fair trial. Because Garcia does not develop his argument to a degree sufficient to allow adequate appellate review, we decline to address the merits of the issue.

¶ 9     It is well established that we will not consider conclusory arguments or bald legal assertions absent development or argument. *See, e.g.*, *People v. Simpson*, 93 P.3d 551, 555 (Colo. App. 2003). Instead, an appellant must apply the legal principles to the facts to establish legal error entitling him to relief.

¶ 10     Garcia lists the following evidence as allegedly improperly admitted other bad acts:

- A police officer testified that Garcia had "an active warrant." Garcia objected to this testimony and

requested a mistrial.  The district court sustained the objection but rather than grant a mistrial, the court instructed the jury to ignore the testimony.

- D.Q. mentioned that Garcia had entered her home several times previously.  Garcia objected to this testimony and requested a mistrial; the district court did not hear the reference, but it still instructed the jury to ignore the testimony.

- Portions of admitted minute orders included the following statements:

  o "[Garcia's parenting time] will be in the form of reintegration therapy at a licensed facility 1 time a week for up to 2 hours at a time.  The reintegration therapy will continue at the discretion of the therapist."

  o "Parties were heard arguing in the hall."

  o "Petitioner states that there is a history of violence from Respondent and she is not comfortable with visits unless they are supervised."

  o "[D.Q. believes] that the children may be hurt."

4

- "Garcia called from Colorado Corrections."

- "There is also a pending D&N case involving the parties' children."

¶ 11    Cumulative error requires reversal when the trial court commits several errors that individually do not necessitate reversal but that, when viewed as a whole, are so prejudicial that the defendant was denied a fair trial. *Howard-Walker v. People*, 2019 CO 69, ¶ 24. However, before we can assess the prejudicial effect of erroneously admitted evidence — if any — Garcia must first establish that errors occurred. But on appeal, Garcia fails to develop any argument as to why the various pieces of other acts evidence he identifies were admitted in error. Indeed, Garcia does not even mention the analytical framework for determining whether

admitted evidence violates CRE 404(b).[2] Rather, he simply lists the allegedly improper pieces of evidence, without offering argument as to why they were inadmissible under CRE 404(b) or relying on any authority governing the admission of that evidence, and then argues that the cumulative effect of these alleged errors deprived him of a fair trial. We will not develop Garcia's arguments for him, *Scholle v. Ehrichs*, 2022 COA 87M, ¶ 80, *aff'd in part and rev'd in part*, 2024 CO 22, and therefore decline to consider whether and why the evidence he identifies was properly or improperly admitted. And without a showing from Garcia as to why any of the other bad acts evidence should have been excluded — much less all of it — he cannot prevail on his argument that cumulative error requires reversal.

---

[2] The Colorado Supreme Court most recently discussed the proper framework for analyzing objections to prior bad acts evidence in *Rojas v. People*, 2022 CO 8. To determine whether evidence is improper other acts evidence, the trial court must first determine if the evidence is extrinsic or intrinsic to the charged offense. *Id.* at ¶ 44. If the evidence is extrinsic (and supports an improper inference that the defendant has a bad character), then the prosecution must establish the evidence is relevant to a common plan, motive, opportunity, or intent. *Id.* at ¶ 48. Once the prosecution establishes a non-propensity purpose for admitting the evidence, then the court weighs the probative value of the evidence against the risk of unfair prejudice. *Id.* at ¶ 52.

## III.    Sentencing

¶ 12    In supplemental briefing submitted in response to an order of this court, Garcia contends that his sentence must be vacated because the district court lacked authority to impose it while Garcia's motion to recuse the trial judge was pending.  We agree.

### A.    Additional Facts

¶ 13    Garcia was represented by a public defender throughout the pretrial and trial proceedings.  At the sentencing hearing, however, Garcia announced that he no longer wished to be represented by his appointed public defender because he believed his public defender was ineffective.  In essence, Garcia argued that his public defender had given the prosecution access to his trial strategy by conspiring with the prosecution and jail deputies to have the jail deputies film Webex conferences between Garcia and his counsel.  Additionally, Garcia claimed counsel intimidated him when advising him on various matters, including about whether to speak at sentencing.  The court attempted to explain, to no avail, that legal strategy was the province of his attorney.  Ultimately, however, the court determined that an irreconcilable conflict had arisen, disqualified the public defender's office from representing Garcia,

7

and granted Garcia's request to have alternate defense counsel (ADC) appointed for sentencing. The court continued sentencing and scheduled a status conference to be held several weeks later.

¶ 14 A day before the new sentencing date, Garcia filed a pro se motion seeking a continuance and the appointment of new counsel. Garcia retracted the request for new counsel at the hearing, but ADC requested a continuance so that he could explore a potential motion for a new trial. The court granted the continuance over the prosecutor's objection and rescheduled sentencing for September 1, 2022. The court emphasized that if a motion for a new trial with new evidence was not filed by then, sentencing would proceed as scheduled.

¶ 15 Three days before the rescheduled sentencing hearing, the court held a hearing on two pro se motions that Garcia had filed. Taken together, the motions sought (1) a new trial based on ineffective assistance of trial counsel and (2) to fire ADC and proceed pro se. ADC explained that Garcia wished to proceed pro se due to fundamental disagreements over strategy — specifically, Garcia's insistence that they litigate his ineffective assistance of counsel claims before sentencing.

¶ 16 After confirming with ADC that the conflict had arisen because Garcia was "requesting that [counsel] take a course of action that [he did] not believe [was] legally justified," the court advised Garcia about his right to representation and inquired into his understanding of the charges against him and the possible penalties. The court emphasized the complexity and difficulties of self-representation, attempted to explain some aspects of sentencing and appellate procedure, and pointed out that sentencing would need to be complete before any ineffective assistance claims could be raised. Garcia reaffirmed he would like to fire ADC, and the court granted the request. However, the court again expressed concern about Garcia's ability to represent himself and inquired further into his wish to proceed pro se.

> Court: Is anyone forcing you, threatening you?
>
> Garcia: No.
>
> Court: Coercing you or putting any pressure on you to get you to waive your right to counsel?
>
> Garcia: No.
>
> Court: And you're not under the influence of any drugs, alcohol, intoxicants, or prescription medication that might impact your ability to

understand your waiver of the right to counsel?

Garcia: No.

Court: Do you suffer from any emotional or mental disability or illness that might impact your ability to understand what you're doing here today?

Garcia: No.

¶ 17  After some further discussion in which the court explained the procedural steps that had to happen before Garcia could raise an ineffective assistance claim, Garcia eventually asked that his ADC be reinstated as his counsel for sentencing. The court granted the request, but before it did so, it denied Garcia's pending pro se motions during the brief window that he was representing himself. The court rescheduled sentencing for September 8, 2022.

¶ 18  Later the same week, ADC requested a status conference after "receiving a message . . . from a family member of Mr. Garcia indicating that [Garcia] believe[ed] there [was] a conflict with [ADC's] representation." When asked to explain the conflict, Garcia told the court that he had a conflict with ADC "because of the simple fact I'm suing the [Office of Alternate Defense Counsel] and the public defenders [office]." The court agreed that this development created

10

a conflict and pointed out another problem: by pursuing his lawsuit, Garcia would be conflicting out every potential court-provided attorney in the state. In response, Garcia requested appointment of an attorney "outside of the [Office of Alternate Defense Counsel], but the court declined, stating that it did not "have that ability." The court then listed Garcia's two options: "You can hire private counsel . . . . You can represent yourself. I don't have any other lawyers to give you."

¶ 19 Garcia responded, "I need somebody to help me — assistance of counsel to help me understand or go through these motions of the due process motion that you have." After the court reminded Garcia that it had already denied his pro se motions, Garcia attempted to pivot, claiming that his ADC had not prepared for sentencing. At this point, the court grew frustrated and issued the following ruling:

> That's not true, Mr. Garcia. You are just blowing smoke at me now. Okay? We continued the matter from the 29th so as to afford [counsel] an opportunity to get prepared, to speak with your sister, your family members, those individuals. Okay.
>
> I'm not buying any of this crap. Okay? It's plain and simple. I'm not.

11

. . . .

What you are doing at this point in time is you are trying to just simply delay the inevitable. You are trying to delay the imposition of a sentence. And this is all a bunch of — it's a game at this point in time. Okay?

So what's going on is you're pulling out every stop you can think of to derail you getting sentenced. Okay? You concocted all this nonsense about the public defender's office being in cahoots with the district attorney's office. Okay? And I gave you the benefit of the doubt; so I removed [the public defender].

I appointed [ADC] to represent you. Okay? You couldn't get along with [ADC], okay, because you know better than the trained lawyer about what needs to be argued. Okay. That's what's going on. This is nothing but delay. Okay?

There has never been an issue with the public defender's office being in league or conspiring to turn over client confidences, therefore, they know strategy and game plan. That's all nonsense. It didn't happen. You know it. . . . You don't want to get sentenced. Okay. But you're going to get sentenced. It's as simple as that. Okay?

You have basically thwarted every attorney's efforts to work with you. All right? . . . You are going to represent yourself at this point in time. Okay? I have given you every chance to have counsel to represent you, and you are just playing a game with me.

¶ 20    Garcia attempted to argue with the court that he still had due process claims and ineffective assistance of counsel claims that he needed help with. He again requested appointment of counsel other than an ADC attorney; the court reiterated, "I don't have the ability to appoint anyone other than alternate defense counsel. What are you not grasping?" The court concluded the hearing, "So it seems to me you've put yourself in a position that you are forced to represent yourself or hire a new lawyer. You have until September 8th to hire a new lawyer."

¶ 21    On September 6, using the Adams County Detention Facility's legal mail system, Garcia mailed a pro se motion to the district court titled "Motion for Judge to Recuse Himself and for Appointment of Defense Counsel." As grounds for his request, Garcia argued that the trial judge had exhibited actual bias against him, including by "lo[sing] his proffessional [sic] composure," "le[aving] his seat," "plac[ing] everyone in the Courtroom in fear for their safety," and announcing before sentencing that he was already planning on sending Garcia back to prison. The motion was stamped received by the district court on September 8, the day of the sentencing hearing.

¶ 22    No one mentioned the motion during the sentencing hearing, but a week later, on September 15, the district court issued an order granting it.  For reasons the record does not reveal, however, the judge who granted the motion subsequently issued several procedural orders.  And despite the recusal, neither party objected to these orders and there is no indication in the record that another judicial officer was appointed to replace the original judge before Garcia filed his notice of appeal.

## B.    A New Sentencing Hearing is Required

¶ 23    When a party files a motion for substitution of a judge based on a claim that the judge is "in any way interested or prejudiced with respect to the case, the parties, or counsel," "all other proceedings in the case shall be suspended until a ruling is made thereon."  Crim. P. 21(b)(1)(IV), (3).  "The rule is designed to ensure that a judge who is the subject of recusal proceedings will not exercise any authority over any aspect of the case so long as that judge's neutrality is questioned."  *People v. Bossert*, 722 P.2d 998, 1007 (Colo. 1986).  And it applies when "the judge's manifestation of hostility or ill will is apparent from the motion and affidavits and

indicates the absence of the impartiality required for a fair trial."
*Brewster v. Dist. Ct.*, 811 P.2d 812, 814 (Colo. 1991).

¶ 24    The People do not dispute that, by utilizing the Adams County Detention Facility's system for legal mail, Garcia's motion was deemed filed on September 6, 2022 — two days before the sentencing hearing. *See* Crim. P. 45(f); *see also Wallin v. Cosner*, 210 P.3d 479, 480 (Colo. App. 2009) (explaining that a complaint filed by an inmate through the prison mail system is filed when it is received by the institution's internal mailing system). Instead, the People point out that the motion was procedurally deficient, and they also argue Garcia waived or forfeited the right to have the motion decided by failing to mention during the sentencing hearing that it had been filed and was still pending.

¶ 25    The People's arguments would have some force if the judge had not later granted the motion. But he did grant it, and he did so without offering any reasons for his decision.[3] In the absence of an

_____

[3] In their supplemental briefing, the People seem to imply that the trial judge did not actually mean to recuse himself because he subsequently ruled on two of Garcia's procedural motions. The judge's actions are indeed puzzling, and it is at least conceivable that his order granting the recusal motion was the result of a

explanation, we can only conclude the trial judge decided to step aside on the grounds asserted in the motion — that he was "interested or prejudiced with respect to the case [or] the parties." Crim. P. 21(b)(1)(IV).

¶ 26 Thus, regardless of the timing of Garcia's motion or whether he should have orally raised it at the sentencing hearing, the record establishes that, one week after sentencing — and with no other proceedings having occurred in the interim — the trial judge recused himself from the case on grounds of actual bias.[4] By granting the motion, the court rendered questions of preservation irrelevant. And on these facts, we can only conclude the timing of the judge's order granting Garcia's motion establishes that, during

---

clerical error. Under some circumstances it might be fruitful to remand the case for clarification of this question. But here, that is impossible because the trial judge is no longer on the bench. *See In re Kiesnowski*, 2024 CO 12.

[4] We note that Garcia's assertions of actual bias were based on the conflict that arose between himself and the trial judge after the trial but before the sentencing date. We have found nothing in Garcia's motion or elsewhere in the record suggesting that the judge harbored any bias against Garcia before or during trial. Thus, our opinion should not be read to suggest that Garcia's convictions were tainted by judicial bias.

sentencing, he harbored the same bias that led to his subsequent recusal.

¶ 27    The judge's decision to recuse himself shows he recognized that he had a "bent of mind" against Garcia. *People v. Drake*, 748 P.2d 1237, 1249 (Colo. 1988). And when a judge is actually biased against a party, "we question the *result*" of the proceeding. *People in Interest of A.P.*, 2022 CO 24, ¶ 29. Accordingly, because the record establishes that the judge presiding over Garcia's case was no longer neutral at the time of sentencing, we must reverse Garcia's sentence and remand the case so that Garcia may be resentenced by a different judge.

## IV.    Disposition

¶ 28    We affirm Garcia's convictions. We reverse the order imposing his sentence and remand the case for resentencing by a different judge.

JUDGE FREYRE and JUDGE LUM concur.