Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us.  Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
July 1, 2019

**2019 CO 69**

**No. 17SC595,** *Howard-Walker v. People*—**Cumulative Error.**

In this case, the supreme court concludes that a division of the court of appeals erred by supplementing this court's cumulative error standard with caselaw from federal courts.  The supreme court reaffirms that the proper standard for analyzing cumulative error claims stems from *Oaks v. People*, 371 P.2d 443 (Colo. 1962).

Applying that standard, the supreme court then concludes that the cumulative prejudicial effect of various trial errors deprived the defendant of a fair trial. Accordingly, the supreme court reverses the judgment of conviction and remands for a new trial.

## The Supreme Court of the State of Colorado
2 East 14th Avenue • Denver, Colorado 80203

---

**2019 CO 69**

---

**Supreme Court Case No. 17SC595**
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 14CA562

---

**Petitioner:**

Kyree Davon Howard-Walker,

v.

**Respondent:**

The People of the State of Colorado.

---

**Judgment Reversed**
*en banc*
July 1, 2019

---

**Attorneys for Petitioner:**
Megan A. Ring, Public Defender
Meredith K. Rose, Deputy Public Defender
*Denver, Colorado*

**Attorneys for Respondent:**
Philip J. Weiser, Attorney General
John T. Lee, Senior Assistant Attorney General
*Denver, Colorado*

**JUSTICE HOOD** delivered the Opinion of the Court.

¶1     Two men, one carrying what seemed to be a gun, broke into an unoccupied Colorado Springs home and stole roughly $8,000 in cash and other valuables from a safe in a bedroom closet. As it happens, the homeowner had a motion-activated camera in his alarm clock. The camera captured the burglary, albeit on grainy footage.

¶2     The homeowner, who owned a video-editing business, enhanced that footage and then shared it with local television news stations, along with an offer of a reward for the "conviction" of the burglars. When the video aired on the news, someone identified the man carrying the gun in the video as the defendant, Kyree Howard-Walker.

¶3     Howard-Walker was ultimately convicted of first degree burglary and conspiracy to commit first degree burglary, after a two-day trial. On appeal, he argued that his relatively brief trial was riddled with errors that, at the very least, collectively warranted reversal.

¶4     A division of the court of appeals sifted through the many errors alleged and eventually identified eight, but also concluded that those errors did not warrant reversal individually or collectively. *See People v. Howard-Walker*, 2017 COA 81M, ¶ 2, __ P.3d __. In reaching this conclusion, the division adopted a new approach to cumulative error review. *Id.* at ¶¶ 118–21. Instead of relying only on our precedent in *Oaks v. People*, 371 P.2d 443 (Colo. 1962), the division sought more guideposts and, in so doing, crafted a two-step, multi-factor test based on precedent from federal circuit courts. *Howard-Walker*, ¶¶ 120–21. After applying this new cumulative error analysis, the division determined that Howard-Walker received a fair trial despite the eight errors. *Id.* at ¶ 125.

¶5    We conclude that the division below erred by supplementing the *Oaks* standard. And under *Oaks*, we reverse because the cumulative effect of these errors deprived Howard-Walker of a fair trial. Because we conclude there was cumulative error, we do not address the question of whether plain error is determined at the time of appeal or the time of trial. Accordingly, we reverse the judgment of conviction and remand for a new trial.

## I. Facts and Procedural History

¶6    In August 2013, D.S. spent a night away from his home in Colorado Springs. When he returned the next day, he found his home in disarray. The garage door was open, and his bed was flipped over. D.S. checked his (accidentally unlocked) safe and saw that burglars had "cleaned [it] out," taking some $8,000 in cash, numerous credit cards, watches, jewelry, and other valuables.

¶7    After verifying that the burglars had left, D.S. checked the motion-activated camera in his alarm clock. The camera had recorded the burglary. The video showed two unfamiliar men, both wearing baseball caps and sunglasses, rummaging through D.S.'s closet. One man held a black backpack. The other held what looked like a gun.

¶8    D.S. called 911. A responding officer took photos of D.S.'s bedroom and the suspected entry point in the back of the house, which featured unfamiliar shoeprints. The officer collected a copy of the video and brought it, as well as a box touched by one of the burglars, back to the precinct for further investigation.

¶9    Despite these efforts by the police, D.S. remained uneasy. Worried that someone might be trying to kill him, he used software from his video-editing business to enhance

3

the crime video. After converting the original footage to a high definition format and editing its length, he sent it to local television news stations. He also offered a reward of $1,000 per "conviction."

¶10 Shortly thereafter, the enhanced video hit the news. Howard-Walker's girlfriend's uncle saw it and went to the police station to report that he knew one of the men in the video based on the sunglasses and hat the man wore. He identified that man as Howard-Walker, and he provided a photo of Howard-Walker wearing a hat and sunglasses like those visible in the video.

¶11 Based on that tip, Detective Mark Garcia contacted Howard-Walker's probation officer and asked him to look at still photos from the video to see whether he thought the man in the video was Howard-Walker. The probation officer said he was "95 percent sure" that it was Howard-Walker in the photos.

¶12 Police then arrested Howard-Walker and took him to a police station where Detective Garcia interviewed him. Howard-Walker denied participating in the burglary, but after the interview, as Detective Garcia walked Howard-Walker back to the holding cell area, Howard-Walker asked Detective Garcia "what [it] would . . . get him if [Howard-Walker] gave [Detective Garcia] the name of the other person" in the video. Detective Garcia responded that "it would build [Howard-Walker's] credibility" with the District Attorney's Office and "it would help him." At that point, Howard-Walker became emotional and stopped talking.

¶13 Upon booking Howard-Walker at the jail, the officers took custody of the personal property he had at the time of his arrest. That property included his shoes and a pair of

4

sunglasses. Detective Garcia thought the sunglasses resembled those in the camera footage. And he found the tread of Howard-Walker's shoes matched the shoeprints found outside D.S.'s home.

¶14 The police also executed a search warrant at Howard-Walker's apartment. The warrant included a list of items the officers were looking for—a gold medallion, a gold chain, three rings adorned with diamonds, approximately $8,000 in cash, twelve credit cards, and multiple watches. The officers found none of these items at Howard-Walker's apartment. The officers also didn't find a gun, a black backpack, or a hat and sunglasses resembling those in the video.

¶15 After the search, Detective Garcia showed Howard-Walker's girlfriend three still photos from the video. According to Detective Garcia, the girlfriend identified Howard-Walker as the man in the photos. When Detective Garcia asked how sure she was, he said she became visibly upset and responded that she was "80 percent" sure.

¶16 Armed with this information, the People charged Howard-Walker with one count of first degree burglary and one count of conspiracy to commit first degree burglary. At trial, Howard-Walker's main defense was that he was not the man in the video, and there was a "race to a conviction" that resulted in an incomplete investigation. The trial lasted less than nine hours over the course of two days, excluding voir dire and jury deliberations. The jury convicted Howard-Walker on both charges.

¶17 On appeal, a division of the court of appeals found eight errors: five resulting from Detective Garcia's testimony (including the detective's opinion about Howard-Walker's truthfulness), *id.* at ¶¶ 47–48, 58, 60, 70, 74, 80; two instructional errors (including failure

5

to offer any instruction on the elements of the predicate crime of theft), *id.* at ¶ 101; and one instance of prosecutorial misconduct (involving the district attorney explicitly commenting on the defendant's failure to testify at trial), *id.* at ¶ 92. Still, it concluded that the one preserved error was harmless, *id.* at ¶ 63, and the other seven unpreserved errors were not plain, *id.* at ¶¶ 48, 72, 74, 81, 94, 102. So, the division turned to Howard-Walker's cumulative error claim.

¶18    The division cited our long-standing decision in *Oaks*. *Id.* at ¶ 119. There, we noted that "numerous formal irregularities, each of which in itself might be deemed harmless, may in the aggregate show the absence of a fair trial." *Oaks*, 371 P.2d at 446. Perhaps unsurprisingly, the division looked beyond that broad standard for more meaningful guidance, particularly regarding how to analyze cumulative error when a defendant has preserved some underlying errors but has failed to preserve others. *See Howard-Walker*, at ¶¶ 118–21. The division adopted a two-step test from the Tenth Circuit. *See id.* at ¶ 118 (citing *United States v. Caraway*, 534 F.3d, 1290, 1302 (10th Cir. 2008)). First, the division stated it would review the preserved errors as a group under the harmless error standard. *Id.* If the preserved errors were not cumulatively harmless, then reversal would be warranted. Second, it would examine the preserved and unpreserved errors to determine whether collectively they were "sufficient to overcome the hurdles necessary to establish plain error." *Id.* (quoting *Caraway*, 534 F.3d at 1302). The division then looked to a nonexhaustive list of factors suggested by the Eleventh Circuit, "including: the nature and number of the errors committed; their interrelationship, if any, and combined effect; how the district court dealt with the errors as they arose (including the efficacy of any

6

remedial efforts); the strength of the government's case; and, the length of the trial," as further guidance. *Id.* at ¶ 121 (citing *United States v. Baker*, 432 F.3d 1189, 1223 (11th Cir. 2005), *abrogated in part by Davis v. Washington*, 547 U.S. 813 (2006)).

¶19    In applying its new test, the division first noted that "even the most serious error—the improper comment on Howard-Walker's exercise of his right against self-incrimination—was fleeting." *Id.* at ¶ 123. "[A]nd the less serious errors bore little relation to each other." *Id.* The division acknowledged that some of Detective Garcia's testimony "may have tended to undermine Howard-Walker's misidentification defense," but ultimately concluded that the impermissible testimony was "brief." *Id.* at ¶ 124. So, the division held that "[e]ven when considered cumulatively, these errors were relatively small events scattered over the course of a two-day trial, during which substantial evidence was presented . . . from which the jury reasonably could have concluded that Howard-Walker was the man with the gun." *Id.* at ¶ 125. The division, therefore, affirmed Howard-Walker's judgment of conviction. *Id.* at ¶ 127.

¶20    We granted Howard-Walker's petition for certiorari.[1]

---

[1] We agreed to review the following issues:

1. Whether the court of appeals erroneously held that five trial errors, two instructional errors, and one instance of prosecutorial misconduct did not rise to the level of cumulative error because the court of appeals applied federal cumulative error law for the first time in Colorado, contradicting this Court's precedent.

## II. Analysis

¶21    We begin with the standard of review. Then we address the law governing cumulative error claims. After deciding to stick with *Oaks*, we apply that standard to Howard-Walker's case and conclude that he did not receive a fair trial. Therefore, we reverse and remand for a new trial.

### A. Standard of Review

¶22    We review questions of law de novo. *See Ronquillo v. People*, 2017 CO 99, ¶ 13, 404 P.3d 264, 267. Determining what the proper standard is for reviewing cumulative error claims is a legal question. *See id.* Therefore, we review it de novo.

### B. The Right to a Fair Trial and Cumulative Error

¶23    "The [D]ue [P]rocess [C]lauses of the United States and Colorado [C]onstitutions guarantee every criminal defendant the right to a fair trial." *Morrison v. People*, 19 P.3d 668, 672 (Colo. 2000); *People v. Roy*, 723 P.2d 1345, 1349 (Colo. 1986) ("A defendant, although not entitled to a perfect trial, has a constitutional right to receive a fair trial." (citation omitted)); *see also* U.S. Const. amends. V, XIV; Colo. Const. art. II, § 25. Encompassed in the right to a fair trial is the right to an impartial jury. *See Oaks*, 371 P.2d at 445–47. This "right comprehends a fair verdict, free from the influence or poison of evidence which should never have been admitted, and the admission of which arouses

---

2. Whether the court of appeals erred in holding that the improper expert testimony was not plain even though the error was plain at the time of direct appeal.

8

passions and prejudices which tend to destroy the fairness and impartiality of the jury."

*Id.* at 447; *see also* U.S. Const. amend. VI; Colo. Const. art. II, §§ 16, 23.

¶24 "[N]umerous formal irregularities, each of which in itself might be deemed harmless, may in the aggregate show the absence of a fair trial, in which event a reversal would be required." *Oaks*, 371 P.2d at 446. Though an error, when viewed in isolation, may be harmless or not affect the defendant's substantial rights, reversal will nevertheless be required when "the cumulative effect of [multiple] errors and defects substantially affected the fairness of the trial proceedings and the integrity of the fact-finding process." *People v. Lucero*, 615 P.2d 660, 666 (Colo. 1980).

¶25 To be clear, cumulative error analysis should never be confused with structural error analysis. Structural error, which can require reversal without assessing prejudice, is

> a limited class of errors described by the [U.S. Supreme] Court as including errors concerning rights protecting some interest other than the defendant's interest in not being erroneously convicted; errors the effects of which are too hard to measure, in the sense of being necessarily unquantifiable and indeterminate; and errors that can be said to always result in fundamental unfairness.

*James v. People*, 2018 CO 72, ¶ 15, 426 P.3d 336, 339–40 (citing *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1908 (2017); *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148, 150, 157 (2006)); *People v. Novotny*, 2014 CO 18, ¶ 21, 320 P.3d 1194, 1201 ("[Structural error] comprehends only those defects affecting *the framework* within which the trial proceeds—errors that infect the entire trial process and necessarily render a trial fundamentally unfair—rather than simply errors in the trial process itself." (emphasis added)). For reversal to occur

9

based on cumulative error, a reviewing court must identify multiple errors that collectively prejudice the substantial rights of the defendant, even if any single error does not. *Cf.* Crim. P. 52 (defining harmless error and plain error). Stated simply, cumulative error involves cumulative prejudice.

¶26     For several reasons we conclude that the court of appeals erred in fashioning a cumulative error test from federal circuit court precedent. First, the parties agree that *Oaks* is the proper standard. Second, *Oaks* has been the lens through which we have analyzed cumulative error claims for nearly sixty years, and, while somewhat opaque, it provides necessary flexibility in addressing cumulative error. Finally, because we ultimately conclude that reversal is warranted under *Oaks*, we need not address now whether a more nuanced test is desirable. For the moment, we simply clarify that the *Oaks* standard governs, regardless of whether any error was preserved or unpreserved[2]— thus, reversal is warranted when numerous errors in the aggregate show the absence of a fair trial, even if individually the errors were harmless or did not affect the defendant's substantial rights.

## C. The Eight Errors

¶27     Of the many errors alleged by Howard-Walker, the division agreed there were eight. *See Howard-Walker*, ¶¶ 2, 117–18. But, the division concluded that none of the

[2] In pushing aside these subtleties here, we do not mean to suggest that we would refuse an invitation to take a deeper dive in another case, in which distinctions about reversibility for different kinds of error might prove more significant. Here, the errors were sufficiently prejudicial that these nuances are less significant.

errors individually demanded reversal. *Id.* at ¶ 2. The division also concluded that the eight errors in the aggregate did not require reversal. *Id.* Howard-Walker, the division held, received a fair trial despite the errors. *Id.* at ¶ 126.

¶28 While the parties agreed that the division erred in adopting a new approach to cumulative error analysis, that's where their agreement ends. Howard-Walker argues that this was a close case and "[t]he errors infected nearly the entirety of this short trial," substantially prejudicing his right to a fair trial. Opening Br. at 64. The People counter that any errors were too "attenuated" from the main issue at trial to constitute a due process violation, and there was "overwhelming" evidence establishing the defendant's guilt.

¶29 As noted, we are not addressing whether the court of appeals correctly identified the trial court's individual errors.[3] Thus, we presume the division below came to the correct conclusion as to those errors, and we limit our review to whether the errors arising from Detective Garcia's testimony, the two instructional errors, and the one instance of prosecutorial misconduct together constitute cumulative error.

¶30 First, we list these eight errors, as determined by the division below.

---

[3] We acknowledge that the second question we granted certiorari on does ask us to review the court of appeals' determination on the reversibility of an identified error. However, because we ultimately resolve this case on cumulative error, we do not need to address that question.

11

### 1. Improper Expert Testimony Regarding Whether the Gun in the Video Was Real

¶31 The prosecutor elicited improper expert testimony from Detective Garcia about whether the gun in the video was real. Without tendering Detective Garcia as an expert witness, the prosecutor asked: "How can you tell that's a real handgun [in the image]?" Detective Garcia responded that he could tell based on the size of the barrel of the gun, which was large enough for a "large projectile to exit the weapon." The division identified this testimony as improper expert testimony offered in the guise of lay testimony in violation of CRE 702 and *Venalonzo v. People*, 2017 CO 9, 388 P.3d 868. *See Howard-Walker*, ¶ 55. The court reasoned this was so because it "strongly doubt[ed] that a witness lacking specialized knowledge [could] determine whether a gun depicted in a video was real or fake based on its barrel size." *Id.*

### 2. Improper Speculation Regarding the Intentions of the Burglar with the Gun

¶32 The prosecutor invited improper speculation by Detective Garcia about what the burglar might have done if he had encountered the homeowner or the police. Over Howard-Walker's objection, Detective Garcia stated that the handgun was "openly displayed with the hand and the finger on the trigger ready to be utilized" and it was held in a "threatening manner." The detective also stated the man in the video was "ready to engage" if confronted by someone in the house. The division found that allowing this testimony was error because it constituted speculation—Detective Garcia didn't have any personal knowledge about what the person on the video would have done. *Id.* at ¶¶ 60–61 (citing *People v. Jones*, 907 P.2d 667, 669 (Colo. App. 1995)). The

12

court also noted that, even if there was sufficient foundation for Detective Garcia's testimony, it offended principles of relevancy and CRE 403. *Id.* at ¶ 62. "What might have happened was not an element of the offense[,]" and "[i]t was immaterial whether the perpetrator might have committed an additional crime had he encountered the homeowner or the police." *Id.*

### 3. Testimony Regarding Probable Cause

¶33 In response to the prosecutor's questions about his investigative process, Detective Garcia improperly testified that his supervisor said that there was probable cause to support a search warrant and an arrest warrant. This was error, the division reasoned, because probable cause to search or arrest was not an issue at trial. *See id.* at ¶ 70 (citing *People v. Mullins*, 104 P.3d 299, 301 (Colo. App. 2004)). So whether a judge or a police officer believed there was probable cause to arrest the defendant was irrelevant to whether the prosecutor established the defendant's guilt at trial. *Id.* (citing *Mullins*, 104 P.3d at 301; CRE 401).

### 4. Testimony Explaining Why the Girlfriend Was Upset

¶34 The prosecutor elicited improper testimony from Detective Garcia about why the defendant's girlfriend grew emotional after stating she was "80 percent" sure it was her boyfriend in the stills from the camera footage. He stated that she was emotional because "[s]he recognized her boyfriend in the photos." The division explained that admitting this testimony was error because Detective Garcia didn't have any personal knowledge of why she was crying "as required by CRE 602." *See id.* at ¶ 74.

13

## 5. Testimony Regarding Howard-Walker's Truthfulness

¶35    The prosecutor improperly asked Detective Garcia whether he felt "in [his] training and experience" that Howard-Walker was being forthcoming during the interview. Detective Garcia said no. The prosecutor then followed up by asking "[d]id you feel like [Howard-Walker] was being truthful with you about his involvement?" To which Detective Garcia also said no. The division determined that it was "improper to ask one witness to opine on the truthfulness of another" when the testimony is not "offered to provide context for the detective's interrogation tactics and investigative decisions." *Id.* at ¶¶ 79–80 (citing *Liggett v. People*, 135 P.3d 725, 733 (Colo. 2006); *Davis v. People*, 2013 CO 57, ¶ 17, 310 P.3d 58, 62–63).

## 6. Failure to Instruct the Jury on the Predicate Crime

¶36    The trial court failed to instruct the jury on the elements of the predicate crime, theft. Both the parties and the division agreed that the "jury instructions were deficient" because the jury wasn't instructed on the elements of theft. *Id.* at ¶ 101; *see also id.* at ¶ 106 (citing *People v. Palmer*, 87 P.3d 137, 140 (Colo. App. 2003)).

## 7. Failure to Define "Intent" for the Jury

¶37    The trial court failed to define the word "intent" for the jury even though "intent" was the culpable mental state for both the burglary charge and the conspiracy charge. The division concluded that this was error because, as with all elements of a crime, the culpable mental state—here, intent—must be "established with the same certainty as any other material element of the crime[s]." *See id.* at ¶ 113 (alteration in original) (quoting *Palmer v. People*, 964 P.2d 524, 527 (Colo. 1998)). And the jury must be instructed on the

14

meaning of the word "intent" because "it carries a 'technical or particular meaning.'" *Id.* (quoting *Griego v. People*, 19 P.3d 1, 7 (Colo. 2001)).

### 8. Prosecutorial Misconduct in Closing Arguments

¶38    In closing arguments, the prosecutor engaged in misconduct when he commented on Howard-Walker's decision not to testify at trial. In discussing the still unknown whereabouts of the stolen items, the prosecutor remarked that "there is only one person in this room that could tell you where all of those items are now and he won't." The division agreed that the "prosecutor stepped over the line" in making this statement and that he was impermissibly commenting on Howard-Walker's decision not to testify. *See id.* at ¶¶ 91–92; *see also Martinez v. People*, 425 P.2d 299, 302 (Colo. 1967) (defining what constitutes an impermissible reference to a defendant's exercise of his right to remain silent at trial). In making this comment, the prosecutor infringed upon Howard-Walker's Fifth Amendment rights. *See Howard-Walker*, ¶ 91 (citing *Griffin v. California*, 380 U.S. 609, 615 (1965)).

### D.  These Eight Errors Cumulatively Warrant Reversal

¶39    We now consider whether the cumulative effect of these errors deprived Howard-Walker of a fair trial.

¶40    In its cumulative error analysis, the division emphasized how each of these errors was "brief" or "fleeting," *see id.* at ¶¶ 123–124, but the entire trial itself lasted less than nine hours (excluding voir dire and jury deliberations), compounding the impact on its fairness. More to the point, the question is not whether the errors were "brief" or

15

"fleeting" but whether, viewed in the aggregate, the errors deprived the defendant of a fair trial. And, here, we conclude that they did.

¶41     In reaching its conclusion, the division reasoned that Detective Garcia's testimony that the gun was real and that Howard-Walker would have "engaged" the homeowner or police if he had encountered either during the burglary didn't implicate the main issue at trial—whether Howard-Walker was one of the perpetrators. *See id.* at ¶ 123. But both pieces of improper testimony helped to prove an element of first degree burglary that sets it apart from second degree burglary: using or threatening the use of a deadly weapon. *Compare* § 18-4-202(1), C.R.S. (2018) (defining first degree burglary), *with* § 18-4-203(1), C.R.S. (2018) (defining second degree burglary). So, this improper testimony helped establish Howard-Walker's guilt of the offenses charged and thus undermined the fairness of the trial.

¶42     Other improper testimony by Detective Garcia also undercut Howard-Walker's primary argument—that he had been misidentified. Detective Garcia's comments about his supervisor agreeing there was probable cause to believe Howard-Walker was the perpetrator could have suggested to the jury that, if a police officer and his supervisor believed there was probable cause to arrest Howard-Walker, maybe they should too. Detective Garcia's speculation about why Howard-Walker's girlfriend cried during her interview took on greater significance, because the girlfriend partially recanted her identification of the defendant at trial.

¶43     While Detective Garcia's testimony about probable cause and the girlfriend's demeanor was perhaps more garden-variety error, the prosecutor's decision to ask

16

Detective Garcia to opine on Howard-Walker's veracity was highly prejudicial. *See Liggett*, 135 P.3d at 732 ("[A]sking a witness to opine on the veracity of another witness is prejudicial, argumentative, and ultimately invades the province of the fact-finder."). Because "were they lying" type questions distort the trial process, we have found them "categorically improper." *Id.* at 733; *see also People v. Wittrein*, 221 P.3d 1076, 1081 (Colo. 2009) ("In Colorado, neither lay nor expert witnesses may give opinion testimony that another witness was telling the truth on a specific occasion."). Allowing the prosecutor to ask, and a police detective to answer, this categorically improper question invited the jury to abdicate its responsibility to assess Howard-Walker's credibility. That invitation was inherently prejudicial.

¶44    That said, we agree with the division that the most serious error occurred during closing arguments when the prosecutor commented on Howard-Walker's exercise of his right to remain silent at trial. *See Howard-Walker*, ¶ 123. A comment is constitutionally impermissible if, "in context, [it] was calculated or intended to direct the attention of the jury to the defendant's neglect or failure to exercise his right to testify in his own behalf." *Martinez*, 425 P.2d at 302; *see also People v. Todd*, 538 P.2d 433, 436 (Colo. 1975). And, after considering the context and content of the prosecutor's comment, there is only one conclusion to draw—it was "calculated" or "intended" to emphasize Howard-Walker's decision to remain silent. The prosecutor stated, at the tail-end of his initial closing arguments, the following:

> Now, as for where the items are now. The stolen items, where are they? As you know there was another person there. So clearly they could be anywhere. Ladies and gentlemen, *there is only one person in this room that*

*could tell you where all of those items are now and he won't*. From what you have heard over the course of this trial, at this point it is proven beyond a reasonable doubt. So please find him guilty of both charges. Thank you.

(Emphasis added.) By drawing attention to the fact that the stolen goods were still missing and suggesting that the only person who knew their location was Howard-Walker, who didn't testify, the prosecutor suggested that Howard-Walker chose not to testify because he was guilty. That was blatantly prejudicial because it penalized Howard-Walker for exercising his constitutional right to remain silent. *See Griffin*, 380 U.S. at 615; *People v. Mozee*, 723 P.2d 117, 123 (Colo. 1986) ("The privilege of a defendant to remain silent 'unless he chooses to speak in the unfettered exercise of his own will' is sufficiently important that the constitution further guarantees that no adverse inferences are to be drawn from the exercise of that privilege at trial." (quoting *Carter v. Kentucky*, 450 U.S. 288, 305 (1981)); *cf. People v. Ortega*, 597 P.2d 1034, 1036 (Colo. 1979) ("Prosecutorial comment which has the effect of creating an inference of guilt by reference to the defendant's silence during custodial interrogation effectively penalizes the defendant for exercising a constitutional privilege.").

¶45 While the instructional errors probably didn't prejudice Howard-Walker, given the nature of his defense, the trial court's failure to define the predicate offense for the burglary, the crime of theft, not to mention its failure to completely define the requisite culpable mental state, certainly did nothing to promote confidence in the fairness of this trial. As the division reasoned, these errors didn't substantially prejudice Howard-Walker because there wasn't any dispute at trial over what the underlying crime was—both the People and Howard-Walker only discussed theft as the possible predicate

18

crime. *See Howard-Walker*, ¶¶ 110–11. Similarly, the division concluded that the failure to define the word "intent" for the jury didn't substantially prejudice Howard-Walker because there was no dispute over "whether the evidence showed that the person in the video acted 'with intent'"—rather, the dispute was whether Howard-Walker was the person in the video. *See id.* at ¶ 114. While the division's analysis in these respects is sound, we noted in *Oaks* that "technical errors may have a significance requiring a reversal in a close case." 371 P.2d at 446.

¶46 And, despite the People's arguments about overwhelming evidence, this case arguably was close in several ways: First, the police never found any of the stolen items, let alone in Howard-Walker's possession. Second, the only piece of physical evidence tying Howard-Walker to the scene of the crime was a common shoeprint. Third, although Howard-Walker was identified as the man in the video by three witnesses aside from Detective Garcia, one of those witnesses partially recanted at trial, another was his probation officer who had only met Howard-Walker "probably three or four" times for about thirty minutes each time, and the third—the defense suggested—had a financial motive for identifying Howard-Walker after seeing the crime video on the news.

¶47 Perhaps the most significant piece of evidence for the prosecution is that Howard-Walker asked Detective Garcia about what he would get if he told him the name of the other man in the video. *See Howard-Walker*, ¶ 125. Not surprisingly, the prosecution characterized that question as tantamount to an admission of guilt. While that is a reasonable inference, it is not the only available inference. Regardless, the

19

probative value of this piece of evidence is not enough to overcome the cumulative effect the eight errors had on Howard-Walker's trial.

¶48 We conclude that the cumulative prejudice caused by these eight errors deprived Howard-Walker of a fair trial, even though individually they were harmless or failed to affect Howard-Walker's substantial rights.

## E. When to Evaluate Plain Error

¶49 Because we conclude that Howard-Walker didn't receive a fair trial due to the cumulative effect of the eight errors, we don't need to reach, and therefore do not reach, the question of whether plain error is determined at the time of appeal or the time of trial.

## III. Conclusion

¶50 We conclude that the division below erred by supplementing the *Oaks* standard. And under *Oaks*, we find reversal is warranted because the cumulative effect of these errors deprived Howard-Walker of a fair trial. Because we conclude there was cumulative error, we do not address the question of whether plain error is determined at the time of appeal or the time of trial. Accordingly, we reverse the judgment of conviction and remand for a new trial.