22CA0798 Peo v Cholo 07-10-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 22CA0798
City and County of Denver District Court No. 19CR8929
Honorable Martin F. Egelhoff, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Bereket T. Cholo,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division VII
Opinion by JUDGE LIPINSKY
Lum and Taubman*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced July 10, 2025

Philip J. Weiser, Attorney General, William G. Kozeliski, Senior Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Jeffrey A. Wermer, Deputy
State Public Defender, Denver, Colorado, for Defendant-Appellant


*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1      Bereket T. Cholo appeals the judgment of conviction entered on a jury verdict finding him guilty of first degree murder after deliberation.  He asserts four trial errors — two evidentiary errors and two instances of prosecutorial misconduct.  He also argues that, even if no single error was reversible, the cumulative effect of the errors requires reversal.  We affirm.

## I.      Background

¶ 2      The jury could have reasonably found the following facts from the evidence introduced at trial.

¶ 3      Cholo worked as an assistant manager for the victim, a 7-Eleven store owner.  Believing that the victim had improperly docked money from his paycheck, Cholo drove to the store to talk to the victim.  Cholo and the victim argued for approximately twenty minutes.

¶ 4      Cholo then removed a kitchen knife from his pocket and stabbed the victim in the neck multiple times.  The victim attempted to run toward the store's front entrance, but Cholo followed him and stabbed him again.  A store security camera recorded the entire incident.

¶ 5     After the victim collapsed, Cholo got into his car and drove home. Paramedics took the victim to a hospital, where he was pronounced dead.

¶ 6     Approximately an hour after the incident, Cholo called 911 and reported that he had done "something wrong," had cut the victim's neck with a knife, and had to "go to jail." Police officers arrested Cholo at his home. Following the arrest, an officer drove him to a police station and commented that he would be charged with first degree murder. Cholo responded, "Oh, he died?" (Cholo's question). A crime scene analyst later found the murder weapon in Cholo's trash can.

¶ 7     Cholo was charged with first degree murder after deliberation. He pleaded not guilty by reason of insanity (which necessarily included a not guilty plea).

¶ 8     At trial, defense counsel did not deny that Cholo fatally stabbed the victim. Rather, the defense argued that Cholo had lacked the mental capacity to discern right from wrong or otherwise form a culpable mental state before he struck the fatal blows and, therefore, did not commit first degree murder after deliberation. The parties further disputed whether Cholo, even if legally sane,

had acted after deliberation. The prosecution argued that Cholo's acts of bringing the knife with him to the store, holding it in his pocket until he pulled it out to stab the victim, following the gravely wounded victim to the front of the store, and stabbing him again after the initial confrontation established deliberation.

¶ 9    The defense presented evidence that, before the killing, Cholo worked long hours, did not sleep much, and was under significant stress. In addition, the defense elicited testimony from Medhanit Dageacho (Cholo's wife) and a forensic psychologist indicating that Cholo's mental health had declined in the days and weeks leading up to the stabbing. Although the forensic psychologist said she diagnosed Cholo with unspecified depressive and trauma disorders, she opined that Cholo was legally sane at the time he stabbed the victim.

¶ 10    During closing argument, defense counsel played a portion of Cholo's 911 call, during which Cholo told the operator that he had "just snapped." Counsel argued that, in light of that statement and the other mental health evidence, the prosecution failed to meet its burden of proving deliberation beyond a reasonable doubt. Counsel also told the jury that it was not bound by the forensic

psychologist's opinions and could reach its own conclusion regarding Cholo's sanity.

¶ 11     The jury convicted Cholo of first degree murder after deliberation. The district court imposed a mandatory life sentence without the possibility of parole.

¶ 12     Cholo asserts four principal arguments on appeal: the court erred by (1) holding that Cholo's question was inadmissible; (2) limiting Dageacho's testimony explaining why she searched the family's garage; (3) not intervening when the prosecutor engaged in misconduct during voir dire; and (4) allowing the prosecutor to misstate the law during rebuttal closing argument.

## II.     Hearsay

¶ 13     Cholo contends that the court erred by barring defense counsel from introducing Cholo's question into evidence. He argues it was admissible because it was not hearsay, or, even if it constituted hearsay, it was admissible under three exceptions to the hearsay rule: statements regarding then-existing mental conditions, excited utterances, and statements against interest. We conclude that, even if the court erred by declining to admit Cholo's question into evidence, any error was harmless.

## A. Additional Background

¶ 14     The police officer who drove Cholo to the police station testified for the prosecution. During the officer's cross-examination, defense counsel asked whether he had communicated with Cholo during the drive. The prosecutor objected on the ground that the question called for a hearsay response. Specifically, the prosecutor argued that defense counsel was attempting to elicit testimony that, after learning about the murder charge, Cholo expressed surprise that the victim had died.

¶ 15     Defense counsel said that Cholo's exact words to the officer were, "Oh, he died?" and argued that Cholo's question was admissible as a statement against interest. The court disagreed, said defense counsel's question to the officer called for a hearsay response, and sustained the prosecutor's objection.

¶ 16     Defense counsel later asked the court to admit Cholo's question through a different witness, this time under the excited utterance exception to the hearsay rule. The court disagreed that Cholo's question was an excited utterance. Defense counsel then asserted that Cholo's question was admissible evidence of his "state of mind" and thus supported the defense's argument that the

5

prosecution had not met its burden of proving "premeditation" and "intent." The court responded, "I'm not saying it wouldn't be relevant. I'm just saying it needs to come in through competent evidence."

### B. Preservation and Standard of Review

¶ 17    To properly preserve an issue for appeal, a party's objection or request must be specific enough to (1) "draw the court's attention to the asserted error"; (2) "provide the court with a meaningful opportunity to focus on the issue"; and (3) give the court an opportunity to "prevent or correct the error." *People v. Anderson*, 2020 COA 56, ¶ 11, 465 P.3d 98, 100. "Raising the 'sum and substance' of an argument is sufficient to preserve it." *People v. Cooley*, 2020 COA 101, ¶ 24, 469 P.3d 1219, 1224 (quoting *In re Estate of Ramstetter*, 2016 COA 81, ¶ 68, 411 P.3d 1043, 1053). But "[i]f an objection or request was made in the trial court on grounds different from those raised on appeal, the issue is unpreserved." *People v. Gee*, 2015 COA 151, ¶ 45, 371 P.3d 714, 722.

¶ 18    Defense counsel preserved the argument that Cholo's question was admissible under two exceptions to the hearsay rule — as a

6

statement against interest, *see* CRE 804(b)(3), or as an excited utterance, *see* CRE 803(2).  Whether counsel preserved the argument that Cholo's question was admissible to prove his mental state — either as nonhearsay or under CRE 803(3) — is a closer question.  Defense counsel indeed argued that Cholo's question was relevant to establish Cholo's "state of mind."  But counsel made no further record regarding the defense's theory of admissibility — including whether the defense was offering Cholo's question as nonhearsay evidence of his state of mind or under the state of mind exception to the hearsay rule, *see* CRE 803(3).

¶ 19    Nonetheless, given the prior colloquy regarding exceptions to the hearsay rule, we conclude that defense counsel provided the court with a meaningful opportunity to consider whether Cholo's question was admissible under CRE 803(3) and to prevent the court's purported error in ruling that Cholo's question was inadmissible under the hearsay rule.  *See Anderson,* ¶ 11, 465 P.3d at 100.  But defense counsel did not preserve the related argument that Cholo's question was admissible because it was not hearsay.

¶ 20    We review a trial court's evidentiary rulings for an abuse of discretion.  *Rojas v. People,* 2022 CO 8, ¶ 16, 504 P.3d 296, 302.  A

7

court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair, or when it misapplies the law. *People v. Johnson*, 2021 CO 35, ¶ 16, 486 P.3d 1154, 1158. However, we review de novo whether a particular statement constitutes hearsay. *See People v. Schnorenberg*, 2023 COA 82, ¶ 10, 541 P.3d 1, 4, *aff'd*, 2025 CO 43, ___ P.3d ___.

### C. Law

¶ 21　　Hearsay is an out-of-court statement offered into evidence to prove the truth of the matter asserted. CRE 801(c). Unless an exception applies, hearsay statements are generally inadmissible because they are presumptively untrustworthy. *People v. Vanderpauye*, 2023 CO 42, ¶ 26, 530 P.3d 1214, 1222.

¶ 22　　A statement cannot be hearsay if the party seeking its admission does not offer it into evidence to prove the truth of the matter asserted. *See People v. Barajas*, 2021 COA 98, ¶ 52, 497 P.3d 1078, 1088 ("An out-of-court statement is not hearsay if it is offered for some other purpose, such as to provide context for other actions, to show its effect on the listener, or to explain why a government investigation was undertaken.").

¶ 23    As relevant here, out-of-court statements that "circumstantially indicate a state of mind [r]egardless of their truth are admissible as non-hearsay statements." *People v. Cavalier*, 584 P.2d 92, 93 (Colo. App. 1978).  Thus, out-of-court statements shedding light on a person's state of mind may or may not be hearsay, depending upon whether they are offered to prove the truth of the matter asserted.  *Id.*

## D.    Analysis

¶ 24    The critical threshold question is whether Cholo's question was hearsay.  In other words, was "Oh, he died?" (1) a statement (2) offered to prove the truth of the matter asserted?  *See* CRE 801(c).

¶ 25    A "statement" is "(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person to be communicative." CRE 801(a).  "The rule against hearsay encompasses not only verbatim out-of-court statements, but also implied hearsay or testimony that raises an inference of out-of-court statements." *People v. Vigil*, 2024 COA 72, ¶ 28, 557 P.3d 805, 812.

¶ 26    The Colorado courts have not previously weighed in on whether questions can be "statements" for purposes of the hearsay rule, although a division of this court resolved an analogous issue — whether a command "phrased as a conditional sentence" is hearsay.  *People v. Phillips*, 2012 COA 176, ¶¶ 102-05, 315 P.3d 136, 160-61 (concluding the directive to two people that they had "better get him something to drink" or he would kill them both was not an "'assertion' offered 'to prove the truth of the matter asserted' and was therefore not covered by the hearsay rule").

¶ 27    Cholo notes the split of authority from other jurisdictions regarding whether questions can be deemed statements for purposes of a hearsay analysis.  Under what he deems the "categorical approach," questions are excluded from the definition of hearsay because they are not assertive speech.  *See, e.g., United States v. Rodriguez-Lopez*, 565 F.3d 312, 314 (6th Cir. 2009); *Terry v. State*, 386 So. 3d 744, 752 (Miss. Ct. App. 2024).  Under the "intent-based approach," an utterance phrased as a question can be an assertion if the declarant intended it to assert a fact.  *See, e.g., United States v. Summers*, 414 F.3d 1287, 1300 (10th Cir. 2005); *State v. Soto*, 2022 UT App 107, ¶ 34, 518 P.3d 157, 163.

¶ 28    In any event, Cholo's question would be hearsay only if the defense sought its admission to prove the truth of the matter asserted — that Cholo had not previously known the victim had died. Defense counsel asserted that Cholo's question was "relevant . . . to his state of mind and the charge being murder in the first degree and the People having to prove premeditation and with intent." Counsel added, "We are arguing about degrees of murder and whether or not somebody knowingly did something or did something in a premeditated fashion with intent." Counsel's theory of admissibility contained significant gaps, however. Counsel did not explain *how* Cholo's question was connected to whether he had killed the victim after deliberation. Nor did counsel establish why Cholo's discovery of the victim's death following the incident was relevant.

¶ 29    But we need not reach these issues because, regardless of whether the court erred by determining that Cholo's question was inadmissible, any error was harmless, as we explain below.

## E.  Even if the Court Erred by Declining to Admit Cholo's Question into Evidence, the Error Was Harmless

¶ 30    We apply harmless error review to preserved contentions of nonconstitutional dimension, reversing only if the error "substantially influenced the verdict or affected the fairness of the trial proceedings." *Hagos v. People*, 2012 CO 63, ¶ 12, 288 P.3d 116, 119 (quoting *Tevlin v. People*, 715 P.2d 338, 342 (Colo. 1986)). "Where there is not a reasonable probability that . . . an error contributed to a defendant's conviction, the error will be disregarded as harmless." *People v. Casias*, 2012 COA 117, ¶ 61, 312 P.3d 208, 220.

¶ 31    The court's decision not to admit Cholo's question into evidence under CRE 804(b)(3), CRE 803(2), or CRE 803(3) did not prejudice him because the evidence of his guilt was overwhelming. *See People v. Martinez*, 2020 COA 141, ¶ 49, 486 P.3d 412, 422 (holding that the court's erroneous evidentiary ruling "was harmless in light of the overwhelming evidence of [the defendant's] guilt"). The forensic psychologist testified that Cholo told her "he decided to take an action" after the victim did not agree to pay Cholo the money withheld from his paycheck.  In addition, the jury watched

12

the store security video depicting the entirety of the stabbing incident and heard that Cholo brought the knife to the store. He held the knife throughout his confrontation with the victim. After stabbing the victim behind the store counter, Cholo followed the victim as he tried to escape through the front door and stabbed him again.

¶ 32 Moreover, Cholo's question was, at most, marginally probative of his state of mind at the time of the stabbing for two reasons.

¶ 33 First, Cholo's knowledge that the victim had died was immaterial to whether he was legally insane at the time of the stabbing. A defendant who commits a premeditated act of murder may not know until sometime later that the plan succeeded and the victim had succumbed. But it is equally true that an insane defendant may not know until after being arrested that the victim died. We perceive no logical connection between a defendant's sanity when the defendant acted and the defendant's knowledge of the consequences of the act. Thus, Cholo's question had no bearing on whether Cholo had a mental disease or defect and (1) was incapable of distinguishing right from wrong or (2) was otherwise

13

incapable of forming the culpable mental state associated with first degree murder after deliberation. *See* § 16-8-101.5(1), C.R.S. 2024.

¶ 34 Second, Cholo's question did not support his alternate theory that, even if he was legally sane, he did not deliberate. First degree murder after deliberation is a specific intent offense. § 18-1-501(5), C.R.S. 2024; § 18-3-102(1)(a), C.R.S. 2024. "A person acts 'intentionally' or 'with intent' when his conscious objective is to cause the specific result proscribed by the statute defining the offense." § 18-1-501(5). "It is immaterial to the issue of specific intent whether or not the result actually occurred." *Id.*; *see also People v. Baca*, 852 P.2d 1302, 1305 (Colo. App. 1992) ("Although the distinction between an awareness of one's conduct or circumstance and an awareness of the result of one's conduct is at times subtle, it is a distinction recognized by the Colorado Criminal Code itself."). The court accurately instructed the jury on this fundamental precept.

¶ 35 Thus, although Cholo asserts that Cholo's question was circumstantial evidence of his "state of mind," he fails to bridge the logical gap between the defense's theories at trial and Cholo's

apparent lack of knowledge, before he learned of the murder charge, that the victim had died.

¶ 36    In light of this record, there is no reasonable probability that the court's decision to exclude Cholo's question contributed to his conviction. *See Casias*, ¶ 61, 312 P.3d at 220.

¶ 37    For the same reasons, any error in the court's ruling that Cholo's question was inadmissible was not plain because it was not substantial, even if it was obvious. An unpreserved error is substantial if it "so undermined the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction." *People v. Crabtree*, 2024 CO 40M, ¶ 43, 550 P.3d 656, 667 (quoting *Wilson v. People*, 743 P.2d 415, 420 (Colo. 1987)). For the above reasons, the court's decision to exclude Cholo's question did not affect the fundamental fairness of Cholo's trial or cast serious doubt on the reliability of the judgment of conviction. *See id.*

¶ 38    In sum, we reject Cholo's argument that the court's exclusion of Cholo's question warrants reversal of his judgment of conviction.

### III. Limits on Witness Testimony

¶ 39    Cholo next argues that the court erred by limiting Dageacho's testimony regarding her inspection of the family's garage and the purpose for which the jury could use her statements about the garage. We disagree.

### A. Additional Background

¶ 40    The defense called Dageacho to testify about Cholo's mental state before the killing. During direct examination, defense counsel sought to elicit testimony that, in the days and weeks before Cholo stabbed the victim, he believed someone had followed him home and asked Dageacho to check whether anyone was in their garage. The following colloquy ensued when defense counsel sought to introduce this testimony:

> DEFENSE COUNSEL: Do you remember one or multiple instances of Mr. Cholo believing that someone was following him?
>
> PROSECUTOR: Objection, hearsay; speculation.
>
> THE COURT: I think you need to lay some foundation for the source or knowledge. If it's based on what someone else told her, it could be hearsay, so you need to lay different foundation.

16

DEFENSE COUNSEL: Sure. You lived with your husband in 2019, right?

WITNESS: Yes.

DEFENSE COUNSEL: [W]hen he was home, were you able to spend any time with him?

WITNESS: During those times just before this incident happened, he was so stressed that he didn't spend much time with us. He was mostly by himself.

DEFENSE COUNSEL: Did you ever go into the garage of your house for him?

WITNESS: Because I had heard him saying that there is something in the garage.

PROSECUTOR: Objection, hearsay.

DEFENSE COUNSEL: Your Honor, this is effect on the listener, subsequent actions she took in response to this. It's not offered for the truth of the matter.

¶ 41 The court called a sidebar conference. Defense counsel clarified the testimony she sought to elicit: Dageacho had checked the garage because Cholo told her he believed people were following him and hiding in the garage (the garage statement). Counsel argued that such evidence was "relevant to the mental health defense" and was not offered to prove that "someone was actually following him or hiding in the garage." Defense counsel reiterated

17

that she was only offering Dageacho's testimony about the garage statement for its effect on the listener — in other words, to explain why Dageacho looked in the garage — and not to prove that strange people were in the garage.

¶ 42     The prosecutor countered that "the truth of the matter here is what the defendant thought," so if Dageacho's testimony regarding the garage statement was offered to prove that Cholo *thought* someone was in the garage, it was being offered for its truth.

¶ 43     The court asked how the defense intended to use the evidence of the garage statement during closing argument.  Defense counsel responded that he planned to use the evidence only to explain why Dageacho went into the garage.  The court said that, if so, the garage statement was being offered for a nonhearsay purpose.  But the court added that defense counsel "can't have it both ways" — if defense counsel only offered the evidence of the garage statement for its effect on Dageacho, counsel could not also rely on it during closing argument to argue that Cholo had lacked the mental state necessary to commit first degree murder after deliberation.  Defense counsel agreed to abide by this limitation.

¶ 44     The court gave the jury a preemptive limiting instruction that Dageacho's testimony about the garage statement was offered only to prove its effect on Dageacho, the listener.  Defense counsel then resumed her direct examination of Dageacho:

> DEFENSE COUNSEL: So around November 2019, did Mr. Cholo tell you that he thought people were following him and hiding in the garage?
>
> WITNESS: Yes.  He used to say that when I'm driving there's somebody following me.  And then he would also say that —
>
> THE COURT: Counsel, I think we're going further than what we talked about at sidebar.
>
> DEFENSE COUNSEL: Let me . . . Did you ever go into the garage at your husband's request to see whether there was someone inside the garage?
>
> WITNESS: Yes, I did go in and check the garage, and there was nothing in the garage.
>
> DEFENSE COUNSEL: No one in the garage?
>
> WITNESS: There was nobody in the garage.
>
> THE COURT: Jurors, just make sure you understand my ruling.  You can consider the statement to explain why she went in the garage, but you cannot consider the statement as to what Mr. Cholo, in fact, believed.

19

¶ 45    During closing argument, defense counsel referred to

Dageacho's — and the forensic psychologist's — testimony about

the garage statement when discussing Cholo's mental state:

> But what we do have from [the forensic
> psychologist] is incredibly helpful information
> about what happens when people are deprived
> of sleep and not just, I didn't get my eight
> hours last night, but I have been working 16 to
> 20 hours a day for seven days a week for as
> long as I can remember.  I am starting to
> hallucinate.  I see shadows where there are
> none.  *I ask my wife to go to the garage to look
> to see if there are people following me.*

(Emphasis added.)  The prosecutor did not object to this argument.

¶ 46    Cholo now contends that the court erred by limiting

Dageacho's testimony because evidence of the garage statement was

admissible to prove Cholo's mental state under section 16-8-109,

C.R.S. 2024.

### B.    Preservation and Standard of Review

¶ 47    The People argue that Cholo failed to preserve his argument

that Dageacho's testimony about the garage statement was

admissible under section 16-8-109 to establish Cholo's state of

mind.  Cholo asserts that, although defense counsel did not cite the

20

statute, his counsel preserved the argument by telling the court that the testimony was "relevant to the mental health defense."

¶ 48   Cholo is mistaken.  Because defense counsel told the court that she was not offering evidence of the garage statement for the truth of the matter asserted, and only intended to introduce it for the limited purpose of its effect on Dageacho, it is unclear to us how the court could have known that counsel *actually* intended to introduce the statement to prove its truth under a statute that she did not cite.

¶ 49   Because Cholo did not preserve his statutory argument regarding the garage statement, we review for plain error and reverse only if the court erred and the error was obvious and substantial.  *Hagos*, ¶ 14, 288 P.3d at 120.  An error is obvious if it contravenes a clear statutory command, a well-settled legal principle, or established Colorado case law.  *Crabtree*, ¶ 42, 550 P.3d at 667.  An error is substantial if it "so undermined the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction."  *Id.* at ¶ 43, 550 P.3d at 667 (quoting *Wilson*, 743 P.2d at 420).

## C. Law

Section 16-8-109 provides:

> In any trial or hearing in which the mental condition of the defendant is an issue, witnesses not specially trained in psychiatry or psychology may testify as to their observation of the defendant's actions and conduct, *and as to conversations which they have had with him bearing upon his mental condition*, and they shall be permitted to give their opinions or conclusions concerning the mental condition of the defendant.

(Emphasis added.) (The General Assembly amended the statute's syntax this year but did not substantively change it. *See* Ch. 15, sec. 15, § 16-8-109, 2025 Colo. Sess. Laws 50.)

### D. The Court Erred by Limiting Dageacho's Testimony Regarding the Garage Statement, but the Error Was Not Plain

Because a statute in effect at the time of Cholo's trial permitted lay witnesses to testify about their "observation of the defendant's actions and conduct, and as to conversations which they have had with him bearing upon his mental condition," and to "give their opinions or conclusions concerning the mental condition of the defendant," § 16-8-109, the court erred by ruling that the jury could not consider evidence of the garage statement when

determining Cholo's mental state. *See also People v. Wright*, 648 P.2d 665, 668 (Colo. 1982) ("Traditionally, the scope of evidence admissible on the issue of insanity is broad. Even lay persons are free to testify as to the sanity of a defendant if a proper foundation is presented."). Because the error contravened a "clear statutory command," the error was obvious. *Crabtree*, ¶ 42, 550 P.3d at 667.

¶ 52     However, the error was not substantial for two reasons. First, Dageacho's testimony regarding the garage statement was cumulative of the forensic psychologist's testimony. *See People v. Caldwell*, 43 P.3d 663, 668 (Colo. App. 2001). The forensic psychologist testified about the garage statement during the defense's case:

> [Dageacho] also mentioned to us that at some point [Cholo] said to her that he could hear someone speaking to him from the garage, from his car, and she went to go check and there was no one there. So, essentially, that he was exhibiting some sort of auditory hallucinations or hearing things that aren't really there.

The prosecutor did not object to this questioning. Therefore, the jury would have learned about the garage statement from the

forensic psychologist regardless of whether Dageacho also testified about it.

¶ 53    Second, during closing argument, defense counsel pointed to the garage statement as evidence of Cholo's mental state before the stabbing.  The prosecutor did not object to this argument.  Thus, regardless of the court's limitation on the scope of Dageacho's testimony regarding the garage statement, defense counsel was able to argue in closing that the jury should consider that Cholo "ask[ed] [his] wife to go to the garage to look to see if there are people following [him]" when deciding whether the prosecution had proved that Cholo possessed the mental state to commit first degree murder after deliberation.

¶ 54    On these facts, we conclude that the court's error by limiting Dageacho's testimony did not prejudice Cholo such that reversal is warranted.

IV.    Prosecutorial Misconduct

¶ 55    Cholo next contends that the prosecutor committed misconduct during voir dire and closing argument, and that the court plainly erred by not intervening to address the alleged

24

misconduct even in the absence of defense objections. We are unpersuaded.

## A. Standard of Review

¶ 56    "While a prosecutor can use every legitimate means to bring about a just conviction, [the prosecutor] has a duty to avoid using improper methods designed to obtain an unjust result." *Domingo-Gomez v. People*, 125 P.3d 1043, 1048 (Colo. 2005). We engage in a two-step analysis when reviewing claims of prosecutorial misconduct. *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010). First, we consider whether the prosecutor's conduct was improper based on the totality of the circumstances. *Id.* Second, we review whether such actions warrant reversal under the proper standard of review. *Id.*

¶ 57    We review unpreserved claims of prosecutorial misconduct for plain error. *Hagos*, ¶ 14, 288 P.3d at 120; *Crabtree*, ¶¶ 42-43, 550 P.3d at 667.

¶ 58    Unpreserved claims of prosecutorial misconduct in closing argument "rarely constitute[] plain error." *People v. Smalley*, 2015 COA 140, ¶ 37, 369 P.3d 737, 745; *see also Hagos*, ¶ 23, 288 P.3d at 122 (reversals on plain error review "must be rare to maintain

25

adequate motivation among trial participants to seek a fair and accurate trial the first time"). "Only prosecutorial misconduct that is 'flagrantly, glaringly, or tremendously improper' warrants reversal under the plain error test." *People v. Duncan*, 2023 COA 122, ¶ 33, 545 P.3d 963, 972 (quoting *Hagos*, ¶ 14, 288 P.3d at 120).

## B. Voir Dire

¶ 59 Cholo contends that the prosecutor committed reversible misconduct during voir dire by educating the prospective jurors on his view of the evidence and securing favorable positions from them. We disagree.

¶ 60 During voir dire, the prosecutor posed a hypothetical scenario to a mother on the jury panel: She finds a valuable vase that had been placed on her dining table shattered on the floor, and her children blame one another for dropping it. The prosecutor asked the mother and the panel, "What kind of evidence might you look for to figure out what happened?" The panel identified eyewitness statements, cuts on the children's hands (physical evidence), consistencies and inconsistencies in the children's stories, surveillance video, and DNA as possible sources of evidence.

26

¶ 61    The prosecutor asked the panel, "How would you decide amongst all this evidence which is more credible?"  One prospective juror answered that "conclusive evidence" such as "video footage" would be the most persuasive.  Another said that video evidence could be instructive because "it's tangible evidence, you can see the action happening."

¶ 62    The prosecutor followed up with this prospective juror:

> PROSECUTOR: [Y]ou've got teddy bear cam video, you've got maybe some DNA off the vase, you've got stories or conflicting accounts from the people that were there, you have a third child who's sort of an independent eyewitness maybe.  How would you decide amongst all those pieces of evidence what actually happened?
>
> PROSPECTIVE JUROR: I'd probably place the most credibility on the camera footage.  DNA would be tough because it's in a common place and other people could have been touching it. Eyewitness would come into account, and then you would have to assess the credibility of that eyewitness. . . .  But as far as in my hierarchy, I would place the video footage highest.

This line of questioning comprised approximately six transcript pages of the thirty-six-page initial voir dire.

¶ 63    Voir dire allows counsel to inquire whether potential jurors hold any biases that would prevent the defendant from receiving a

fair trial. *People v. Wilson*, 2013 COA 75, ¶ 12, 318 P.3d 538, 541. Crim. P. 24(a)(3) grants trial courts discretion to limit improper voir dire. For example, trial courts may limit voir dire that instructs the jurors on a party's theory of the case. *See Wilson*, ¶ 13, 318 P.3d at 541. The *Wilson* division explained that a court may do so because "[t]he knowledge or ignorance of prospective jurors concerning questions of law is generally not a proper subject of inquiry for voir dire since it is presumed that the jurors will be adequately informed as to the applicable law by the instructions of the court." *Id.* (quoting *People v. Collins*, 730 P.2d 293, 301 (Colo. 1986)).

¶ 64    The prosecutor's questioning about different types of evidence did not educate the prospective jurors on the prosecution's theory of the case, contrary to Cholo's contention. Rather, it elicited their perspectives on the relative strengths of different forms of evidence to prove who committed an act. Further, Cholo does not point us to any legal authorities that would have alerted the court it needed, even in the absence of a defense objection, to bar the prosecutor from referring to different forms of evidence during voir dire.

¶ 65    Under the circumstances, the court did not plainly err by not sua sponte cutting off the prosecutor's questioning regarding different types of evidence.

## C.    Closing Argument

¶ 66    Cholo next asserts that the prosecutor committed reversible misconduct during rebuttal closing argument by misstating the law of first degree murder after deliberation.

¶ 67    Defense counsel argued that Cholo could not have deliberated before stabbing the victim because, as he told the 911 operator, he just "snapped." During rebuttal closing argument, the prosecutor responded by saying, "[Cholo] said he snapped. Snapping does not mean not deliberating. You can snap and still think about what you're about to do."

¶ 68    The prosecutor's statement was not consistent with the law concerning deliberation.

¶ 69    A person commits murder in the first degree if, after deliberation and with the intent to cause the death of a person other than himself, he causes the death of that person. § 18-3-102(1)(a). "The term 'after deliberation' means not only intentionally but also that the decision to commit the act has been

made after the exercise of reflection and judgment concerning the act." § 18-3-101(3), C.R.S. 2024. "An act committed after deliberation is never one which has been committed in a hasty or impulsive manner." *Id.*

¶ 70 "The prosecutor must 'scrupulously avoid comments that could mislead or prejudice the jury.'" *Duncan*, ¶ 31, 545 P.3d at 972 (quoting *Domingo-Gomez*, 125 P.3d at 1049). Accordingly, prosecutors may not misstate the law. *People v. Monroe*, 2020 CO 67, ¶ 16, 468 P.3d 1273, 1276.

¶ 71 Cholo contends that the prosecution's assertion that a person can both snap and deliberate was inaccurate as a matter of law. *See People v. Bartowsheski*, 661 P.2d 235, 242 (Colo. 1983) ("What is required for the element of deliberation is that the decision to kill be made after the exercise of reflection and judgment concerning the act."); *People v. McBride*, 228 P.3d 216, 224-25 (Colo. App. 2009) (holding that the prosecutor misstated the law by analogizing the "after deliberation" element of first degree murder to a one-second decision to drive through a yellow light). We agree that the prosecutor misstated the law and that the court's lack of

intervention was therefore an obvious error. But the error was not plain because it was not substantial.

¶ 72    First, the prosecutor's misstatement of law was brief and isolated. The prosecutor referred to "snapping" only once during closing arguments, and it amounted to two lines of text in a ten-page argument. *See People v. Cuellar*, 2023 COA 20, ¶ 75, 530 P.3d 1236, 1251 (no reversible error where statement was brief); *People v. Liebler*, 2022 COA 21, ¶ 51, 510 P.3d 548, 559 (reversible error more likely where misconduct is repeated). Although the statement was one of the last things the jury heard before it began deliberating, *see Domingo-Gomez*, 125 P.3d at 1052, the prosecutor immediately followed it with a review of the evidence reflecting Cholo's mental state.

¶ 73    That evidence included that Cholo

- brought the knife with him to the store;

- argued with the victim for approximately twenty minutes;

- held the knife throughout the argument;

- had time to think during at least one break in the argument when the victim stepped away to greet a vendor;

- after initially stabbing the victim, followed the victim to the door and stabbed him again; and

- told the forensic psychologist that he "decided to take an action" during his argument with the victim.

¶ 74     Further, the court provided the jury with the correct definition of deliberation: that "the decision to commit the act has been made after the exercise of reflection and judgment" and that the act is not "committed in a hasty or impulsive manner." (Quoting § 18-3-101(3).) The prosecutor repeated that correct statement of law during his initial closing argument. The court further instructed the jury, "While the attorneys may comment on some of [the rules of law], you must follow the instructions I give you," and "[y]our decision must be made by applying the rules of law that I give you to the evidence presented at trial." We presume the jury understood and followed these instructions. *Bondsteel v. People*, 2019 CO 26, ¶ 62, 439 P.3d 847, 856.

¶ 75     For these reasons, the court's error in not intervening to strike the prosecutor's brief remark about "snapping" was not plain because it was not substantial.

## V. Cumulative Error

¶ 76    Cholo contends that if we determine the court erred and that none of the errors individually requires reversal of his conviction, we should nevertheless reverse because of the errors' cumulative prejudicial impact. "For reversal to occur based on cumulative error, a reviewing court must identify multiple errors that collectively prejudice the substantial rights of the defendant, even if any single error does not." *Howard-Walker v. People*, 2019 CO 69, ¶ 25, 443 P.3d 1007, 1011. "Stated simply, cumulative error involves cumulative prejudice." *Id.* The relevant inquiry is "whether, viewed in the aggregate, the errors deprived the defendant of a fair trial." *Id.* at ¶ 40, 443 P.3d at 1014; *see Vigil*, ¶ 48, 557 P.3d at 815 (explaining that, to determine whether errors are harmless individually or collectively, we must conduct a "case specific assessment of the likely impact of the error[s] in question on the outcome of the litigation as a whole" (quoting *Pernell v. People*, 2018 CO 13, ¶ 22, 411 P.3d 669, 673)).

¶ 77    As discussed above, the court made two, and possibly three, errors — it may have erred by excluding evidence of Cholo's question, it erred by ruling that Dageacho's testimony about the

garage statement was inadmissible, and it erred by not stepping in when the prosecutor misstated the meaning of "after deliberation" during rebuttal closing. But given the nature of the two errors and the possible third error, coupled with the overwhelming evidence of Cholo's guilt, "we cannot conclude that the cumulative effect of the errors substantially prejudiced [his] right to a fair trial." *People v. Mendenhall*, 2015 COA 107M, ¶ 82, 363 P.3d 758, 775 (holding that the cumulative effect of the trial court's admission of irrelevant testimony and the prosecutor's improper statements did not substantially prejudice the defendant's right to a fair trial).

## VI. Disposition

¶ 78    The judgment is affirmed.

JUDGE LUM and JUDGE TAUBMAN concur.